**CASE NO. 25-1235**

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

**FAREED N. HAYAT,**

*Plaintiff/Appellant,*

**V.**

**DIAZ, et al.**

*Defendant/Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND (The Hon. Lydia Kay Griggsby)

**(*CORRECTED*) OPENING BRIEF FOR PLAINTIFF-APPELLANT**

———————————————————

Aderson B. Francois
GEORGETOWN LAW
  CIVIL RIGHTS CLINIC
600 New Jersey Ave.,
  NW, Suite 352
Washington, D.C. 20001
(202) 661- 6721

*Counsel for Plaintiff-Appellant*

July 23, 2025

Laila Ahmed
Thomas Stanley-Becker
Yisroel Margolin
Douglas Wickman

*Student Counsel*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

Introduction .............................................................................1

Jurisdictional Statement .............................................................2

Statement of Issues .....................................................................3

Statement of the Case.................................................................3

    I.        Factual Background...................................................3

        *A. Police Dispatch Received an Uncorroborated Second-Hand Report that a Black Man Was Seen Putting Three Children in the Trunk of a Car*.................3

        *B. Police Officer Casey Diaz Entered Professor Hayat's Property* .................4
*Without a Warrant and Without Consent*..........................................................

        *C. Police Forced Their Way Into Professor Hayat's Home to Investigate a Kidnapping Based on a 911 Call that a Witness Saw a Black Man In a Public Parking Lot Opened His Trunk, Yelled at Some Kids and Closed His Trunk*.....8

    II.        Procedural History ...................................................9

Summary of Argument .............................................................10

Standard of Review .................................................................12

Argument .............................................................................13

    I. The District Court Erred in Holding that a *Terry* Stop Had Occurred Despite Evidence to the Contrary...................................................13

    II.   The District Court Erred in Holding that Reasonable, Articulable Suspicion Alone Supported Entry Onto Professor Hayat's Porch Because The Fourth Amendment Requires Either a Warrant or Exigent Circumstances to Enter a Person's Home........................................17

        *A.   Professor Hayat's Porch is Curtilage and Part of His Home* ...................17

        *B.  Defendant Officers Illegally Entered Professor Hayat's Porch Without His Consent*..........................................................................................18

C.   *An Ordinary Person Would Have Had No Implied License to Treat the Porch as Different from the Rest of the Home* ...................................................19

D.   *The Fourth Amendment Does Not Permit Officers to Enter a Home to Initiate a Seizure or Conduct a Search Without a Warrant or Exigent Circumstances* ...................................................................................................21

**III. The District Court Erred When It Resolved At Summary Judgment In Favor of Police Disputed Questions Of Fact About Whether The Alleged Terry Stop Was Supported By Reasonable, Articulable Suspicion** .............22

A. *The Complainant's Kidnapping Report and Description of the Suspect Did Not Provide Defendants Reasonable, Articulable Suspicion Because The Report Did Not Bear Sufficient Indicia of Reliability* ......................................23

B.   *Defendants Did Not Corroborate The Complainant's Report* ...................27

C.   *Sergeant Diaz's Interaction Outside Professor Hayat's Home Could Not Have Provided Reasonable, Articulable Suspicion* ...........................................29

D.   *The District Court Erroneously Concluded that the Facts it Considered Material to its Reasonable, Articulable Suspicion Analysis are Undisputed* ...36

**IV. The Court Erred in Holding that Police May Enter a Home to Continue a Terry Stop Even in the Absence of Any Exigent Circumstances**................39

**V. The District Court Erred in Resolving at Summary Judgment Disputed Questions of Fact About Whether Exigent Circumstances Existed to Justify Home Entry to Continue a *Terry* Stop**.........................................................44

**Conclusion**...............................................................................................................51

**Statement Regarding Oral Argument** ...............................................................52

TABLE OF AUTHORITIES

**Cases**

*Allotey v. Baltimore Cnty., Maryland*, 2022 WL 17105120 (D. Md., Nov. 2, 2022). ..................................................................................................33, 41

*Alto v. Chicago*, 863 F.Supp. 658 (N.D.Ill. 1994). ...............................................16

*Brigham City v. Stuart*, 547 U.S. 398 (2005)................................22, 46, 47, 49, 52

*California v. Ciraolo*, 476 U.S. 207 (1986). ........................................................18

*California v. Hodari D.*, 499 U.S. 521 (1991). ....................................................15

*Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186 (4th Cir. 2015). ..........................22

*Edwards v. United States*, 379 A.2d 976 (D.C. 1977). ...................................42, 43

*Florida v. J.L.*, 529 U.S. 266 (2000). .............................................................24, 27

*Florida v. Jardines*, 569 U.S. 1 (2013). ...............................................18, 20, 21, 22

*Gowen v. Winfield*, 130 F.4th 162 (2025). ...........................................................13

*Harbin v. City of Alexandria*, 712 F. Supp. 67 (E.D. Va. 1989). ................42, 43, 44

*Kentucky v. King,* 563 U.S. 452 (2011)................................................................46

*Michigan v. Fisher,* 558 U.S. 45 (2009)....................................................46, 47, 49

*Mincey v. Arizona*, 437 U.S. 385 (1978).........................................................46, 47

*Oliver v. United States*, 466 U.S. 170 (1984).......................................................19

*Ricci v. DeStefano*, 557 U.S. 557 (2009)..............................................................31

*Rivera v. Washington*, 57 Fed.Appx. 558 (4th Cir. 2003)..............................passim

*Rogers  v. Pendleton*, 249 F.3d 279 (4th Cir. 2001).......................................21, 22

*Terry v. Ohio*, 392 U.S. 1 (1968)....................................................................15, 23

*United States v. Arvizu*, 534 U.S. 266 (2002)......................................................31

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013).....................................31, 32

*United States v. Brown*, 401 F.3d 588 (4th Cir. 2005)......................................passim

*United States v. Curry*, 965 F.3d 313 (4th Cir. 2020). ..........................23, 30, 43, 46

*United States v. Dupree*, 2013 WL 4499037 (D. Md. 2013). ................................44

*United States v. Evans*, 722 F.Supp.3d 607 (W.D.N.C. 2024)...............................24

*United States v. Foster*, 824 F.3d 84 (4th Cir. 2016). .............................................31

*United States v. Glover*, 804 F.3d 677 (4th Cir. 2011)............................................31

*United States v. Hill,* 649 F.3d 258 (4th Cir. 2011). ..............................................46

*United States v. Jackson*, 585 F.2d 653 (4th Cir. 1978).........................................22

*United States v. Lawing*, 703 F.3d 229 (4th Cir. 2012)....................................24, 25

*United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011)..................................35

*United States v. Mendenhall*, 446 U.S. 544 (1980).................................................15

*United States v. McNeil*, 126 F.4th 935 (2025)......................................................20

*United States v. Mitchell*, 963 F.3d 385 (4th Cir., 2020). ......................................28

*United States v. Peters*, 60 F.4th 855 (4th Cir. 2023). .....................................passim

*United States v. Santana*, 427 U.S. 38 (1976).............................................42, 43, 44

*United States v. Slocumb*, 804 F.3d 677 (4th Cir. 2015)...................................passim

*United States v. Van Dyke*, 643 F.2d 992 (4th Cir. 1981)................................19, 22

*United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013).....................................46, 51

## Introduction

Appellant, Fareed Hayat, a Black criminal defense attorney and law professor, had returned home from an outing with his two young sons when three officers from the Montgomery County Police Department (MCPD) forced their way inside without his consent, without a warrant, and in the absence of any exigent circumstances. They drove him to the ground, handcuffed him, bloodied his mouth, pushed a taser into his body and pulled the trigger, though the taser did not fire.

Officers tracked Professor Hayat home using his license plate based on a second-hand 911 report from a caller, who had been told by another bystander that he saw a black man in a parking lot of a restaurant open the trunk of a car, yell at three children, and close the trunk of the car. The emergency operator relayed the call as a "kidnapping," even though neither the second-hand caller, nor the original bystander used that term. In truth, Professor Hayat had strapped his two young boys into their legal rear-facing seats to drive them home after leaving an International House of Pancakes.

Professor Hayat brought this present action against individual officers, the MCPD Chief of Police, and Montgomery County, alleging claims under the Fourth and Fourteenth Amendment to the United States Constitution, as well as Maryland

1

state tort law.  The district court granted summary judgment to defendants on all of Professor Hayat's claims.

The Court erred in five ways. First, the court erred in assuming that a *Terry* stop had occurred at Professor Hayat's home when no such stop had taken place. Second, the court erred in assuming that reasonable, articulable suspicion alone is sufficient to permit police to enter any part of a person's home to effectuate a search and seizure. Third, the court erred in resolving at summary judgment in favor of police disputed questions of fact about whether the alleged *Terry* stop was supported by reasonable, articulable suspicion. Fourth, the court erred in holding that police may continue a *Terry* stop inside a home even in the absence of any exigent circumstances.  Last, the court erred in again resolving at summary judgment disputed questions of fact whether exigent circumstances existed to justify entering the home to continue a *Terry* stop.

## Jurisdictional Statement

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201. J.A. 23. On February 12, 2025, the district court granted defendant's motion for summary judgment, disposing of all parties' claims. J.A. 316. The appelant then filed a timely notice of appeal on March 11, 2025. J.A. 317. This Court has jurisdiction under 28 U.S.C. § 1291.

2

**Statement of Issues**

Whether the district court erred as a matter of law when: (I) it assumed that law enforcement had initiated a *Terry* stop before entering the home; (II) it assumed reasonable, articulable suspicion alone is sufficient to permit police to enter any part of a person's home; (III) it resolved at summary judgment in favor of police disputed questions of fact about whether the alleged *Terry* stop was supported by reasonable, articulable suspicion; (IV) it held that police may continue a *Terry* stop inside a home even in the absence of any exigent circumstances; and (V) it again resolved at summary judgment disputed questions of fact whether exigent circumstances existed to justify entering the home to continue a *Terry* stop.

**Statement of the Case**

I.    **Factual Background**

*A. Police Dispatch Received an Uncorroborated Second-Hand Report that a Black Man Was Seen Putting Three Children in the Trunk of a Car*

On October 22, 2017, the Montgomery County Emergency Communication Center (ECC) received a report from an individual that he "was told by another driver that he saw someone grab three children and put them in the trunk of a vehicle." J.A. 42. This individual, who identified himself only as "Luis," stated to the ECC dispatcher that he had not witnessed the incident but was told by the person

3

who witnessed the incident to follow a car and was given a license plate number. J.A. 42. While the license plate number provided matched to a dark blue Tesla, the car that Luis followed was a white Range Rover. J.A. 42. Luis provided no identifying information about the three children and no information about the suspect other than that he was a Black male driver in a white Range Rover with tinted windows. J.A. 42.

The ECC dispatcher advised Montgomery County Police Department (MCPD) Officers to "respond priority for a kidnapping" in the area of Piney Branch Road and University Boulevard. J.A. 300. MCPD Officer Jorge Moran told other officers over the air that he found the witness to the incident who reported that he was at an IHOP in Langley Park and saw a Black male open a trunk, yell at kids, and close the trunk; Officer Moran also reported that "Teslas have rear-facing seats in the trunk, so they might be able to sit there." J.A. 300 The witness also told Officer Moran that he observed two children strapped into the car. J.A. 42.

*B. Police Officer Casey Diaz Entered Professor Hayat's Property Without a Warrant and Without Consent*

MCPD officers traced the license plate in the report to the residence of Fareed Hayat, a criminal defense attorney and  law professor at Howard University School of Law, and Norrinda Brown, Professor Hayat's then spouse, herself a law professor

4

at the University of the District of Columbia School of Law. J.A. 42.[1] Sergeant Casey Diaz was the first to arrive at the residence. J.A. 43

Sergeant Diaz parked his police cruiser outside of Professor Hayat's home and entered the property by walking up the driveway, where he noticed Professor Hayat and Professor Brown on their porch. J.A. 319. Sergeant Diaz said he "found it suspicious that the individuals were standing outside of the residence, not engaging in any other activity, allegedly anticipating police arrival." J.A. 52. While approaching the home, and during the conversation that followed, Sergeant Diaz could not see the Tesla, which was parked in the garage behind the closed garage door. J.A. 301.

Sergeant Diaz then engaged Professors Hayat and Brown in a conversation, during which Professor Hayat talked "in a calm, polite, and conversational tone …" J.A. 183.  Below is a verbatim transcript of that conversation:

**Sgt. Diaz**: "Hi, how are you doing? Everything okay here?"

**Prof. Hayat**: [indiscernible]

**Sgt. Diaz**: "Were you guys just at the IHOP down in Langley Park?"

---

[1] At the time of the incident giving rise to the present action, Professor Hayat was a faculty member at Howard University School of Law, and Professor Brown was a member of the University of the District of Columbia law faculty.  As of this writing Professor Hayat is a faculty member at Seton Hall University School of Law, and Professor Brown is a member of the Fordham University School of Law faculty.

**Prof. Hayat**: "What's the problem?"

**Sgt. Diaz**: "We got a call of a kidnapping, or something like that, were you guys down at the IHOP?"

**Prof. Hayat**: "There is no kidnapping here, sir."

**Sgt. Diaz**: "What?"

**Prof. Hayat**: "There is no kidnapping here, sir."

**Sgt. Diaz**: "Okay, well I just need to make sure everybody is ok."

**Prof. Hayat**: "Okay...how are you going to do that?"

**Sgt. Diaz**: "Well, we are talking. We are talking."

**Prof. Hayat**: "Everything is ok here."

**Sgt. Diaz**: "Well, I need to check. Are there any kids here?"

**Prof. Hayat**: "Yes."

**Sgt. Diaz**: "Well, can we see them?"

**Prof. Hayat**: "You cannot come into our house. We are both lawyers. I am a professor at [Howard University], she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home."

[Overheard in the background] **Prof. Brown**: "I am a professor of law."

**Sgt. Diaz**: "Can you come down here for a second?"

**Prof. Hayat**: "I cannot."

**Prof. Brown**: "Can you explain to us what is going on here?"

**Sgt. Diaz**: "Yeah, somebody saw something involving some kids at an IHOP . . . "

**Prof. Hayat**: "Norrinda, walk into our home please. Walk into our home. If you would like to come into our home without a warrant. . ." J.A. 274-275.

As Professors Hayat and Brown ended the conversation and reentered their home, Sergeant Diaz rushed onto the porch and ordered Professor Hayat to "open the door." J.A. 301. Sergeant Diaz and several other officers then forced their way into the home; they took Professor Hayat to the ground and handcuffed him. J.A. 72. While taking Professor Hayat to the ground, the officers pushed a taser unto his body and bloodied his mouth. J.A. 218, 294, 305 at 00:06:20-00:06:30. Officers confirmed that they observed the Hayats' children and that they physically appeared to be fine and were sure no kidnapping occurred. J.A. 279.

*C. Police Forced Their Way Into Professor Hayat's Home to Investigate a Kidnapping Based on a 911 Call that a Witness Saw a Black Man In a Public Parking Lot Open His Trunk, Yell at Some Kids and Close His Trunk*

When officers arrived at Professor Hayat's home, all they knew was that they were looking for a black male (no description of height, weight, skin-tone, or age) who drove a black Tesla, and who had shouted in a public parking lot at three children of no description at all, and supposedly put them into a trunk. J.A. 92, 100-

102. They also knew that some Tesla models have perfectly legal rear facing seats, and that the person who had originally claimed to call in the alleged kidnapping followed the wrong vehicle. J.A. 97, 300.

When Sergeant Diaz approached Professor Hayat's home, all he saw was Black man and a Black woman standing on a porch. He did not know whether the man on the porch was the same as the one at the IHOP; he did not know whether the children had been put in a trunk or strapped into their seats; he did not know the number of children the 911 caller reported, their gender, or even what they looked like; and he could not see the Tesla whose tag was associated with the report: the only car parked in front of the home was a white car. J.A. 100-103,; J.A. 300 at 00:00:31-00:00:48. The Tesla Professor Hayat had been driving that day was parked inside the garage, behind a closed garage door. J.A. 274, 300 at 00:00:31-00:00:48.

By the time the officers left Professor Hayat's home after driving him to the ground, they knew there had been no kidnapping – a word neither the 911 caller nor the witness used. J.A. 139, 121, 183-184. Further, the officers learned that Professors Hayat and Brown were both law professors, that Professor Hayat practiced criminal law, and that Professor Hayat understood his rights. J.A. 274, 306 at 00:03:01-00:03:25.

8

## II.     Procedural History

Professor Hayat filed his complaint on October 15, 2020. J.A. 7. After the district court granted in part and denied in part defendants' motion to dismiss on January 27, 2022, defendants filed their motion for summary judgment on July 24, 2024. J.A. 12, 18. Pending before the district court on summary judgment was Professor Hayat's claims of 1) violations of Maryland Law; 2) Fourth Amendment violations; 3) 42 U.S.C. § 1983 violations; and 4) *Monell* liability. J.A. 271. In addition to arguing against each of the above claims, defendants also raised qualified immunity as a defense against Professor Hayat's Fourth Amendment claim. J.A. 271, 287.

The district court granted defendant's motion for summary judgment on February 12, 2025, on the ground that officers lawfully entered Professor Hayat's home pursuant to a *Terry* stop. J.A. 20, 288. First, the district court found that defendant officers were responding to the crime of kidnapping as inferred from tips by an anonymous second party caller and an identified original complainant that children were grabbed and put into a trunk. J.A. 289. Second, the district court found that 1) an in-person talk with the original complainant, 2) the original complainant's identification of Professor Hayat's license plate, 3) Professor Hayat and his wife's meeting of Sergeant Diaz on the porch of their home, 4) Professor Hayat's lack of surprise upon being questioned, and 5) Professor Hayat's ending of the conversation

9

between himself, his then-wife, and Sergeant Diaz were, in totality, sufficient to provide defendant officers reasonable, articulable suspicion for a *Terry* stop. J.A. 289-291. The district court then held that because defendant officers had reasonable, articulable suspicion they were then justified to forcefully enter Professor Hayat's home. J.A. 292. Because the district court found that the officers' entry into Professor Hayat's home was lawful, it did not address Professor Hayat's Maryland law and *Monell* claims, and did not address the defendant's qualified immunity claims. J.A. 292, J.A. 294-295.

Professor Hayat timely filed his notice of appeal of the district court's decision on March 11, 2025. J.A. 21.

## Summary of Argument

On the actual undisputed facts, Sergeant Diaz and two other MCPD officers entered Professor Hayat's porch, forced his door open, put him in cuffs, and bloodied his mouth based on a bystander's account of a Black male yelling at children in a public parking lot of an IHOP, opening and then closing the trunk of a car. In granting summary judgment, the district court lowered the *Terry* stop standard to include virtually any interaction a civilian might have with the police; broadened the standard for reasonable, articulable suspicion to allow police to initiate a stop based solely on subjective assertions; extended the emergency-aid exception to include

10

situations where no emergency is apparent; and gave law enforcement a seeming carte blanche to enter homes without a warrant, probable cause, or exigent circumstances. In approving these standards, the district court erred in five ways.

*First*, the district court erred in holding that Sergeant Diaz initiated a *Terry* stop outside of Professor Hayat's home. For a *Terry* stop to occur, there must be, at a minimum, a show of authority such that a reasonable person would not feel free to go. Sergeant Diaz did not show any such authority before Professor Hayat reentered his home. Sergeant Diaz gave Professor Hayat no indication that the interaction was custodial and a reasonable person in Professor Hayat's position – particularly a criminal defense attorney trained in Fourth Amendment jurisprudence - would have felt free to leave.

*Second*, the district court erred in holding that reasonable, articulable suspicion alone supports Sergeant Diaz's entry onto Professor Hayat's porch absent a warrant. Professor Hayat's porch, as curtilage, receives the same protection as the home. Therefore, police may only enter the porch to the same extent a regular person may: to seek permission for entry. When entry is denied, the standard to enter the porch is probable cause.

*Third*, the district court erred in holding that the undisputed, material facts dictate a finding that Sergeant Diaz had reasonable, articulable suspicion that Professor Hayat had been involved in a crime. The district court failed to consider

11

both the unreliability of the complainant's tip and the officers' failure to corroborate the tip; the district court also treated Sergeant Diaz's subjective opinions as facts. Even facts deemed material by the district court remain disputed.

*Fourth*, the district court erred in holding that law enforcement may enter a person's home to continue a *Terry* stop. The district court based this statement of law on cases that dealt either with officers who had probable cause or suspects who were fleeing from the police after explicitly being told to stop. These cases do not support a rule that does not require probable cause or exigent circumstances to enter a home.

*Fifth*, the district court erred in holding that a need to render emergency aid and protect the welfare of the children justified the officers' warrantless entry into Professor Hayat's home. The officers had unreliable information, and there were no signs of struggle, chaos, or anything else that indicated that kidnapped children were in the home.

## Standard of Review

The Court reviews summary judgment decisions *de novo*. *Gowen v. Winfield*, 130 F.4th 162, 171 (4th Cir. 2025) (citation omitted). "Summary judgment is appropriate only if there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law…A factual dispute is genuine if the

12

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 171-72 (citation omitted).

## Argument

### I. The District Court Erred in Holding that a *Terry* Stop Had Occurred Despite Evidence to the Contrary

The district court in this case held, relying primarily on *Rivera v. Washington*, 57 Fed. Appx. 558 (4th Cir. 2003)[2], that "a suspect's retreat into their home cannot thwart a *Terry* stop, if the officers had reasonable suspicion of criminal activity prior to the retreat." J.A. 292. The court concluded that "the Defendant Officers' entry

---

[2] *Rivera v. Washington*, 57 Fed.Appx. 558 (4th Cir. 2003) is an unpublished opinion dating prior to 2007. This Circuit's Local Rule 32.1 provides:

> Citation of this Court's unpublished dispositions issued prior to January 1, 2007, in briefs and oral arguments in this Court and in the district courts within this Circuit is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case. If a party believes, nevertheless, that an unpublished disposition of this Court issued prior to January 1, 2007, has precedential value in relation to a material issue in a case and that there is no published opinion that would serve as well, such disposition may be cited if the requirements of FRAP 32.1(b) are met.

The present brief cites to and extensively analyzes *Rivera* because the district court itself relied upon it as primary authority for the propositions that a *Terry* stop had occurred and, therefore, Professor Hayat was not free to retreat back into his home.

13

into the Residence to continue the *Terry* stop was constitutionally permissible under the Fourth Amendment." J.A. 292.

The district court incorrectly assumed that Sergeant Diaz initiated a *Terry* stop of the Hayats outside their home. J.A. 292. The court held that "the undisputed material facts in this case show that the Defendant Officers had reasonable, articulable suspicion to conduct an investigatory stop before the plaintiff retreated into the Residence." J.A. 292. But the court did not find facts supporting a conclusion that the officers had, in fact, initiated a *Terry* stop. This constituted reversible error because the defendants did not begin a detention of the Hayats pursuant to a *Terry* stop outside their home.

The court held that the officers' entry into the Hayats' home "to continue the *Terry* stop was constitutionally permissible." J.A. 292. However, defendant officers did not initiate a *Terry* stop of the Hayats when they were questioning them outside the Hayats' home because the Hayats felt free to leave the encounter. A person is seized pursuant to a Terry stop "… only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A "*necessary*, but not *sufficient*, condition for seizure" is that some objectively determinable "show of authority" has been conveyed such that a

14

reasonable person would not feel free to leave. *California v. Hodari D.*, 499 U.S. 521, 628 (1991).

A reasonable person in the Hayats' position would have felt free to leave the encounter with the police, and thus would have concluded that they were not seized pursuant to a *Terry* stop outside their home, because the encounter was a wholly voluntary conversation, not a *Terry* stop. Sergeant Diaz was simply having a conversation with the couple as he approached them. Sergeant Diaz asked them, "Hi, how are you doing? Everything ok here?" J.A. 301 at 00:00:38-00:01:47. He then asked, "Were you guys just at the IHOP down in Langley Park?" J.A. 301.  He then inquired if he could ensure that everyone in their household was "ok" and, in response to Professor Hayat's reply "how are you going to do that," Sergeant Diaz said, "Well, we are talking." J.A. 301. At no point during the interaction did Sergeant Diaz show any sign of "authority" suggesting that the Hayats could not re-enter their home. A reasonable person from the perspective of the Hayats would not conclude that, having a conversation with a police officer, meant they were seized pursuant to a *Terry* stop and were not free to leave.  What's more a person in Professor Hayat's position, who is trained (and trains others) in Fourth Amendment caselaw, would have understood that, unless and until Sergeant Diaz by word or deed made it clear that the Hayats were not free to go, he and his wife were well within their rights to end the conversation and walk back into their home.

Because Sergeant Diaz did not start a *Terry* stop of the Hayats on the porch, he was not legally justified in forcibly entering their home to complete the *Terry* stop. *See generally* J.A. 301. This Court in *Rivera*, which the district court cited as its principal authority in support of its decision, held that an officer was "entitled to conduct a *Terry* stop of [a person alleged to be involved in a domestic dispute] once he arrived at the scene of . . . [the] dispute" because the officer "*ordered [the person] to stand by*" but the person "disobeyed" the officer's "order to stand by and entered [his apartment.]" 57 Fed. Appx. at 560 (emphasis added). *See also Alto v. Chicago*, 863 F.Supp. 658, 661-62 (N.D.Ill. 1994) (cited in *Rivera*, 57 Fed. Appx. at 562) ("Likewise, *an officer who stops a person* because of a reasonable, articulable suspicion of criminal activity, . . . *need not terminate the stop* merely because the suspect flees to his home) (emphasis added).

In *Rivera*, an officer received a complaint about a domestic dispute and then entered the parking lot behind the home at issue to investigate. 57 Fed. Appx. at 560. The officer then commanded the alleged perpetrator of domestic abuse to wait as he interviewed the alleged victim of the abuse. *Id.* The officer's command certainly amounted to a *Terry* stop as an objectively reasonable person in the alleged perpetrator's position would not feel free to leave the encounter with the officer. But *no* similar command was given in this case.

Here, the Hayats' interaction with Sergeant Diaz is distinct from that of the defendant in *Rivera*, on which the district court relies, because, unlike the officer in *Rivera*, Sergeant Diaz issued no command but instead explained they were just having "a conversation." Thus, under *Terry*, the Hayats reasonably believed they were free to leave the interaction. J.A. 301 at 00:00:45-00:01:47; *cf. Rivera*, 57 Fed. Appx. at 560. Because the Hayats had no reason to believe that they were seized pursuant to a *Terry* stop, the district court erred in holding that the defendant officers were permitted to enter the Hayats' home to "continue the *Terry* stop." J.A. 292.

**II. The District Court Erred in Holding that Reasonable, Articulable Suspicion Alone Supported Entry Onto Professor Hayat's Porch Because The Fourth Amendment Requires Either a Warrant or Exigent Circumstances to Enter a Person's Home**

The district court erroneously failed to address the defendant officers' unlawful entry onto the curtilage of Professor Hayat's home without a warrant or exigent circumstances.[3] Since a *Terry* stop had not been effectuated, the defendants' non-consensual entry onto Professor Hayat's porch constituted a violation of the Fourth Amendment, even before they entered the home or touched Professor Hayat.

A. *Professor Hayat's Porch is Curtilage and Part of His Home*

---

[3] For a discussion of exigent circumstances, *see* Sections IV-V *infra*.

17

The porch is part of the curtilage of a home and thus is treated in the same way under the Fourth Amendment as the home. *See Florida v. Jardines*, 569 U.S. 1, 5-6 (2013) ("The officers were gathering information in an area … immediately surrounding [the home]–in the curtilage of the house, which we have held enjoys protection as part of the home itself.") The *Jardines* Court held that the area around the home is "intimately linked to the home, both physically and psychologically," and is a space where "'privacy expectations are most heightened.'" *Id.* at 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The porch is a "classic exemplar" of an area in the curtilage of the home, which the Supreme Court has held to be an extension of the home and thus granted the same privacy expectations. *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 182 n. 12 (1984)). This Circuit has also held that the porch of the home is curtilage and treated the same as a home under the Fourth Amendment. *United States v. Van Dyke*, 643 F.2d 992, 993 (4th Cir. 1981).

B.  *Defendant Officers Illegally Entered Professor Hayat's Porch Without His Consent*

Defendant officers unlawfully entered Professor Hayat's porch without his consent. *See* J.A. 301.  They rushed onto the porch to stop Professor Hayat from re-entering his home. Defendants admit that they needed to enter the porch to effect the seizure of Professor Hayat. *See* J.A. 301 at 00:00:38-00:01:48. Sergeant  Diaz's body

18

camera footage shows him rushing onto the porch and forcibly trying to open the door after Professor Hayat had reentered his home. J.A. 301 at 00:01:40-00:01:48.

Professor Hayat clearly did not consent to the officers entering his porch. Just before they rushed unto the porch, Professor Hayat refused to allow Sergeant Diaz to enter his home to check if the kids were "okay" – "You cannot come into our house . . . This is our home. You do not have a warrant. You are not coming into our home." J.A. 301 at 00:00:38-00:01:47. Then, Sergeant Diaz asked if Professor Hayat could come down from his porch and Professor Hayat refused to do so – "I cannot." J.A. 301 at 00:00:38-00:01:47. Professor Hayat did not consent to the officers' entry onto the porch.

## C.   *An Ordinary Person Would Have Had No Implied License to Treat the Porch as Different from the Rest of the Home*

Absent a warrant or exigent circumstances, law enforcement may not enter on the curtilage of a person's property beyond the extent that an ordinary individual would be allowed to do so. *United States v. McNeil*, 126 F.4th 935, 944 (4th Cir. 2025) (citing *Jardines*, 569 U.S. at 8). The Supreme Court in *Jardines* ruled that there is a customary invitation only for "a visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 569 U.S. at 8. Beyond that implicit license, however, the Court

19

ruled entry illegal. *Id.* at 9. For example, if officers enter the curtilage to conduct a canine sniff, they need a warrant, because "there is no customary invitation to do *that*." *See id.* at 8-9 (emphasis in original).

In *McNeil*, officers walked onto the defendant's porch, knocked, and were informed that the defendant was not present. 126 F.4th at 940. At this point, had the officers left, they would have remained within the law. *Id.* at 943. However, the officers, being denied entry, did not leave as an ordinary person is required to do, but instead entered the defendant's backyard, where they found and arrested the defendant. *Id.* at 940. As in *Jardines*, this Court found that after knocking and being denied entry, law enforcement may not remain on or reenter the curtilage, because "[t]here is no customary invitation to do *that*." *Id.* at 944 (emphasis in the original) (quoting *Jardines*, 569 U.S. at 9).

As discussed above, Professor Hayat explicitly denied defendant officers permission to come onto his porch. J.A. 275. When he denied consent for entry, by making it clear that he would not answer questions, he also revoked law enforcement's implied license to come on to the porch to request it. *See Rogers v. Pendleton*, 249 F.3d 279, 288 (4th Cir. 2001) (concluding that after the subject of questioning analogous to a knock-and-talk asked an officer to leave the premises, the officer had no legitimate reason to remain within the curtilage unconnected with a warrantless search). After being asked to leave, defendant officers' only business

20

on the porch was to effectuate a seizure of Professor Hayat, and surely, "[t]here is no customary invitation to do *that*." *See Jardines*, 569 U.S. at 9 (emphasis in the original).

### D.   The Fourth Amendment Does Not Permit Officers to Enter a Home to Initiate a Seizure or Conduct a Search Without a Warrant or Exigent Circumstances

Even if the defendants had reasonable, articulable suspicion to effectuate a *Terry* stop, the defendants illegally entered the porch to effect the seizure and conduct a search because it is considered the same as the home under the Fourth Amendment.

This Court held that probable cause is the standard required for searches of the curtilage. *Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir. 2001). ("The district court had a strong basis for its holding that probable cause is required for a search of the curtilage of a home."). The Court has held that reasonable suspicion alone is insufficient to permit officers to search the curtilage. *Id. See also Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186 (4th Cir. 2015) (quoting *Rogers*, 249 F.3d at 287) (holding that probable cause, not reasonable, articulable suspicion is the standard for searches of the curtilage); *Brigham City v. Stuart*, 547 U.S. 398, 403–404 (2005) (describing exigent circumstances allowing the warrantless search of a home).

This is true even if the porch and the people on it are in plain view because the constitutional offense is "physically entering and occupying the area to engage

21

in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 6. This Court in *Van Dyke* held that "[b]ecause expectations of privacy are inherent in the common law concept of 'curtilage,' we have recently reiterated that absent exigent circumstances a warrantless search of one's home or its curtilage, *when effected through trespass*, violates the Fourth Amendment." 643 F.2d at 993 (citing *United States v. Jackson*, 585 F.2d 653, 660 (4th Cir. 1978)) (emphasis added).

Here, Sergeant Diaz entered the curtilage and thus the home both to effect a seizure and thereafter to conduct a search pursuant to the kidnapping report. Both were unconstitutional in the absence of a warrant or exigent circumstances.

## III. The District Court Erred When It Resolved At Summary Judgment In Favor of Police Disputed Questions Of Fact About Whether The Alleged Terry Stop Was Supported By Reasonable, Articulable Suspicion

Even assuming, as the district court found, that the defendant officers initiated a *Terry* stop, there remains a genuine dispute of material fact regarding the bases on which the officers subjected Professor Hayat to a *Terry* stop because 1) the kidnapping tip provided by the complainant lacked reliability; 2) the officers did not take sufficient steps to corroborate the complainant's tip; 3) the objective factors the district court cited do not amount to reasonable, articulable suspicion when

22

considering the totality of the circumstances; and 4) the facts that the district court deemed materiel are in dispute.

*A. The Complainant's Kidnapping Report and Description of the Suspect Did Not Provide Defendants Reasonable, Articulable Suspicion Because The Report Did Not Bear Sufficient Indicia of Reliability*

"Under *Terry*, an officer may conduct a brief investigatory stop based on reasonable, articulable suspicion of criminal activity." *United States v. Curry*, 965 F.3d 313, 320 (4th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). For a tip from a known individual to provide officers reasonable, articulable suspicion to conduct a *Terry* stop, the tip must establish "substantial and verifiable details that establish[] the necessary indicia of reliability." *United States v. Evans*, 722 F. Supp. 3d 607, 615 (W.D.N.C. 2024) (citing *United States v. Lawing*, 703 F.3d 229, 237 (4th Cir. 2012)). In determining the reliability of a tip, courts consider factors like the tip's "reliab[ility] in its assertion of illegality" and its "tendency to identify a certain person." *Florida v. J.L.*, 529 U.S. 266, 266 (2000); *see Lawing*, 703 F.3d at 237. While speaking with a tipster face-to-face bolsters the reliability of the tip, that alone is not dispositive. *See Evans*, 722 F. Supp. 3d at 611. Ultimately, tips need to be corroborated by officers and that process of corroboration is of "crucial importance" to courts in considering the reasonableness of a *Terry* stop. *United States v. Peters*, 60 F.4th 855, 866 (4th Cir. 2023); *see United States v. Brown*, 401

23

F.3d 588, 596 (4th Cir. 2005) ("To justify a Terry stop, such a tip must contain sufficient 'indicia of reliability' to enable officers to evaluate the veracity of the tip before stopping whomever the tip identifies.").

Upon making contact with the original complainant, all that the officers knew of the ongoing situation was that a "Black male" in a Tesla strapped two children into his trunk, yelled at them, closed the door, and then drove off. J.A. 42. Although dispatch categorized this as a kidnapping, neither the initial second party caller nor the original complainant used that language to describe the situation when questioned in person. J.A. 42, 200. Finally, the district court never discussed whether defendants further questioned the original complainant about the basis for his belief that these children were in danger, how he knew the children were being kidnapped, or additional facts that would corroborate the veracity of his report. *See* J.A. 273.

Based on the above facts, the district court erred because it failed to analyze the reliability of the tip made by complainant. The tip did not bear the sufficient "indicia of reliability" to give the defendants reasonable, articulable suspicion to stop Professor Hayat for the crime of kidnapping. *Lawing*, 703 F.3d at 237.

First, the original complainant's description of the suspect as a "Black male" driving a Tesla is the kind of "brief, general description" of an individual the Fourth Circuit has found insufficient to establish tip reliability. *United States v. Brown*, 401 F.3d at 596 (finding insufficient an anonymous tip that described the plaintiff as "a

24

short, black male"). It is undisputed that defendant officers did not have "any further description" plaintiff's appearance before arriving at his home. J.A. 100.

Nor was the complainant's identification of Professor Hayat's license plate sufficient to provide reliability because the original complainant recruited the second party caller to follow a car completely distinct from Professor Hayat's. J.A. 5842 Despite the original complainant allegedly following Professor Hayat and relaying their knowledge to the second party caller, the second party caller followed "the wrong vehicle," a white Range Rover–a vehicle quite distinct from the Hayats' dark blue Tesla. J.A. 42.

Second, the original complainant's report contains no discernable "assertion of illegality" that would confirm its reliability. The original complainant had no knowledge other than personal belief to explain why he thought a crime was occurring involving the children, never describing the incident as a kidnapping and never claiming Professor Hayat in particular was involved aside from identifying his license plate. J.A. 42. The original complainant never saw the children well enough to identify their age, race, appearance, or whether they bore signs of physical harm, and defendant Sergeant Diaz admitted that, at the time he arrived at Professor Hayat's home, defendant officers only knew that the original complainant saw a man put kids into a trunk, yell at them, and drive off, without any "description of the

25

children" that would suggest a true kidnapping was occurring. J.A. 42, J.A. 97-98, J.A. 102.

Finally, since no other responding officer that night had more concrete knowledge concerning the kidnapping, the collective knowledge of the officers was also limited to the facts above. J.A. 128-130, J.A. 153-154.

In *Brown*, the Fourth Circuit held that a tip that provided a general description of the suspect and only the allegation of illegal conduct was insufficient to provide officers reasonable, articulable suspicion. 401 F.3d at 596. Like in *Brown*, the description of Professor Hayat as a Black male in a Tesla is too general to be reliable. Similarly, the complainant's report of a kidnapping amounts to mere allegation of illegal conduct since no facts were alleged beyond Professor Hayat allegedly yelling at his children that would show the children were in danger, let alone that he was kidnapping children in public.

In sum, this court should reserve the district's court holding that the officers had reasonable articulable suspicion to effectuate a *Terry* stop because the district court 1) failed to discuss what indicia of reliability the report itself had; 2) wrongly reasoned that officers discussing the report face-to-face with the complainant was alone dispositive in establishing the report's reliability despite Fourth Circuit precedent; and 3) concluded that the complainant's report of a Black male was merely a "minor discrepancy" "not sufficient to find a constitutional violation"

26

despite Supreme Court and Fourth Circuit precedent concluding otherwise. *See Florida v. J.L.*, 529 U.S. 266, 266 (2000); *United States v. Brown*, 401 F.3d at 596.

### B. Defendants Did Not Corroborate The Complainant's Report

Even if the report was sufficiently reliable on its face, defendant officers failed to corroborate or ask for corroborating facts from either reporting party and failed to weigh facts that cut against the reliability of the report. Because courts in this Circuit have found similar facts crucial in finding that officers lacked reasonable, articulable suspicion, the district court's failure to account for these facts constitutes clear error and justifies reversal by this Court.

This Court has made clear that regardless of whether a complainant is known to officers or not "[b]ecause tips vary in reliability, we have found it necessary to 'take into account all the facts surrounding a tip in assessing the totality of the circumstances supporting a stop.'" *Peters*, 60 F.4th at 866; *see United States v. Mitchell*, 963 F.3d 385, 391 (4th Cir., 2020); *Brown*, 401 F.3d at 596. In assessing the reasonableness of an officer's *Terry* stop, "[i]t is [] of crucial importance that [defendant officer] had not taken any notable steps to corroborate the [] informant's statement." *Peters*, 60 F.4th at 866. In *Peters*, the Fourth Circuit held that officers did not have sufficient reasonable, articulable suspicion to *Terry* stop an individual where their stop was based on an uncorroborated informant report and where the suspect directly answered officer's questions. 60 F.4th at 870–71.

The first report of the alleged kidnapping was made by a second party caller who defendant officers were never able to identify and who was following the wrong vehicle. J.A. 42. Although the second party caller never used the word kidnapping, the second party caller relayed that "he was told by another driver that he saw someone grab 3 children and put them in the trunk of a vehicle," which gets reported as a kidnapping by dispatch. J.A. 42, 199. Although defendant officers then made contact with the original complainant, at no point did they learn of additional facts that would help them corroborate whether a kidnapping was taking place. J.A. 42, J.A. 100, 102.

Further, between making contact with the original complainant and arriving at Professor Hayat's house, defendant officers learned of two facts that actually diminished the reliability of the already vague reports. First, defendant officers learned that the initial second party caller was following the wrong vehicle. J.A. 42. Second, defendant officers learned upon locating the original complainant that the alleged Tesla involved in the kidnapping may have rear-facing seats in the trunk, undermining the report of the children being "thrown" into a trunk. J.A. 42.

In conclusion, the district court erred by failing to consider the defendant officers' inability to corroborate any facts concerning the kidnapping. Like in *Peters*, the defendant officers failed to corroborate and arbitrarily trusted a facially vague report that children were yelled at and erroneously treated it as if a confirmed

28

kidnapping was actively ongoing. *Peters*, 60 F.4th at 870–71. If the district court had considered this a genuine dispute of material fact would have arisen concerning the defendant officer's reasonable, articulable suspicion and therefore it was clear error for the court to not conduct this analysis. *Id.* at 866.

Nor would it be enough to correct the district court's error for defendant officers to claim that they were acting pursuant to a 911 call and thus the urgency of the situation justified their action. To begin with, as we show in Section V *infra*, there is no evidence in the record that establish or suggest exigent circumstances. But more to the point, this Circuit in *United States v. Curry* already made it clear that, even in emergency circumstances, officers are still required to have "specific information about the suspect and the alleged crime" to justify a *Terry* stop. *United States v. Curry*, 965 F.3d 313, 325–26 (4th Cir. 2020).

## C.   Sergeant Diaz's Interaction Outside Professor Hayat's Home Could Not Have Provided Reasonable, Articulable Suspicion

The only other factor the district court cited in holding that the defendant officers had reasonable, articulable suspicion was "the conduct of the plaintiff" once defendant Sergeant Diaz arrived at Professor Hayat's home. In analyzing Sergeant Diaz's beliefs, however, the district court overstepped its role at the summary judgment stage. Specifically, although facts may be undisputed, what is disputed is how the facts as stated could justify an officer developing reasonable, articulable

suspicion. The district court ignored this issue of genuine dispute by flatly holding that Sergeant Diaz's subjective beliefs were nevertheless objectively "corroborated by the body-worn footage of his initial encounter with the plaintiff." J.A. 290. Thus, the district court's failure to consider the counternarrative of Professor Hayat as to what reasonable, articulable suspicion could develop from defendant Sergeant Diaz's encounter outside Professor Hayat's home is inconsistent with its duty to view genuine disputes as to material facts in the light most favorable to the nonmoving party and is an independent point on which this Court can reverse the lower court's decision. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

In order to conduct a *Terry* stop, "[t]he level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015) (citing *United States v. Black*, 707 F.3d 531 (4th Cir. 2013)). While "innocent factors, when viewed together, can amount to reasonable suspicion. . . . [courts] are skeptical of 'government attempts to spin … largely mundane acts into a web of deception.'" *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). Ultimately, courts look at the "totality of the circumstances in determining whether an officer had reasonable suspicion of criminal activity." *Slocumb*, 804 F.3d at 682 (citing *United States v. Arvizu*, 534 U.S. 266 (2002)).

30

This Circuit has made clear that while "innocent factors, when viewed together, can amount to reasonable suspicion. . . . [Courts] are skeptical of 'Government attempts to spin … largely mundane acts into a web of deception.'" *Foster*, 824 F.3d at 89. In *Slocumb*, for example, this Court held that officers did not acquire reasonable, articulable suspicion to *Terry* stop an individual only after talking with him. 804 F.3d at 684. First, this Court noted that "it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset." *Id.* at 683 (citing *United States v. Glover*, 804 F.3d 677 (4th Cir. 2011)). Second, the Court found that where the plaintiff did not "attempt to evade [] officers . . . 'acknowledge [them] [sic], was not noticeably nervous, and did not hastily flee the area'" the officers could not develop sufficient particularized suspicion to justify a *Terry* stop. *Id*.

An independent, overriding issue with the district court's analysis of Sergeant Diaz's encounter with Professor Hayat is that it assumes the truth of the kidnapping report instead of analyzing how officers developed a particularized suspicion that Professor Hayat actually committed a kidnapping. *Slocumb*, 804 F.3d at 682 (citing *United States v. Black*, 707 F.3d 531 (4th Cir. 2013)). Defendant officers merely asserted  - and the district court assumed - that behavior as generalized as "not appear[ing] surprised" and not allowing an officer to invade one's property somehow support a particularized suspicion of kidnapping, an illogical assumption

31

that in effect justifies officers to conduct "general searches that [the Fourth Circuit] [has] found to violate the Fourth Amendment." *Peters*, 60 F.4th at 868; J.A. 274.

Even when considering the facts of the encounter, the factors the district court considered as supporting reasonable, articulable suspicion are inconsistent with this Circuit's precedent.

The first fact from the interaction the district court used to find defendant officers had reasonable, articulable suspicion was that Professor Hayat was "already standing on the front step of [his] residence" despite Sergeant Diaz not using his cruiser's "lights and sirens" to signal his arrival. J.A. 290.  Like in *Slocumb*, however, Professor Hayat's attempts to acknowledge officers and talk with them directly instead of avoiding them should not count against him when analyzing reasonable, articulable suspicion. *Slocumb*, 804 F.3d at 683. This is particularly so given that on summary judgment all reasonable factual inferences must be made in favor of the non-moving party.  The record shows Professor Hayat and his spouse saw the police coming up their driveway and went out on their porch to meet them. Insofar as the disputed factual inference is between Sergeant Diaz finding it suspicious that the Hayats were waiting for him on their porch and the Hayats deciding to go investigate why the police were on their property the district court erred in weighing that inference in favor of the police.  But more to the point, the police cannot use "whatever facts are present, no matter how innocent, as indicia of

32

suspicious activity," they need to "logically demonstrate . . . [how] the behavior is likely to be indicative of some more sinister activity." *Id.* at 684. Here, it is illogical to consider Professor Hayat meeting Sergeant Diaz on his curtilage as "suspicious activity" because in rhis Circuit if Professor Hayat was inside his home, defendant officers could never have entered his home based only on reasonable, articulable suspicion. *Allotey v. Baltimore Cnty., Maryland*, 2022 WL 17105120, at *6 (D. Md., Nov. 2, 2022).

Next, the district court relied on the fact that, upon Sergeant Diaz relaying to Professor Hayat that a reported kidnapping occurred outside an IHOP in Langley Park, he 1) "did not appear surprised" and 2) "did not acknowledge whether or not he had been at the IHOP." J.A. 290. First, the district court's consideration of "not appear[ing] surprised" as supporting the officer's reasonable, articulable suspicion is clear error since "extreme nervousness" is what courts should consider when analyzing scenarios where the suspect "did not try to flee or leave the area." *Slocumb*, 804 F.3d at 683. Second, while Professor Hayat did not acknowledge the part of Sergeant Diaz's question about his presence at an IHOP, he did answer Diaz's question by saying "there is no kidnapping here." J.A. 275. Given that the district court was dealing with a scenario where a citizen like Professor Hayat "would normally be expected to be upset" the expectation is not that Professor Hayat would respond perfectly to Sergeant Diaz. *Slocumb*, 804 F.3d at 683. Instead Professor

Hayat's clear acknowledgment of the officer and calm responses should have been considered to dispel Diaz's suspicion especially given the vagueness of the original complainant's report and the lack of facts establishing illegality. *Id.* Most reasonable people would be understandably alarmed and upset to have police show up at their door and inquire whether they had kidnapped children. Professor Hayat's reaction is exactly the sort police would want so as to avoid any dangerous escalation: calm and composed. That fact alone cannot be the basis for reasonable suspicion.

Finally, the district court relied on Professor Hayat ending the dialogue between Sergeant Diaz and Professor Brown as evidence to support reasonable, articulable suspicion. J.A. 291. Like in *Slocumb*, given that by this point Professor Hayat had already engaged with Sergeant Diaz in a non-extremely nervous manner and thus "dispell[ed]" the officer's suspicion, "there was no more reason to suspect that [plaintiff] was engaged in criminal activity than there was to believe his stated purpose and corresponding actions." *Slocumb*, 804 F.3d at 684. Thus, the district court should have at least found a genuine dispute of material fact regarding the officer's reasonable, articulable suspicion arising from this interaction. Second, "'a refusal to cooperate' alone does not justify a seizure" and Professor Hayat, already having answered the defendant officer's questions concerning the kidnapping, was justified in ending the conversation. *Peters*, 60 F.4th at 868 (citing *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011)). Next, Sergeant Diaz's reasonable,

34

articulable suspicion cannot be justified on the basis of wanting to engage in an "exchange of information" since, by that point, the officers had failed to ask for identifying information about the children or why the complainant knew they were at risk of harm and had failed to learn any facts about the altercation that would give rise to a particularized suspicion of kidnapping.

By this point, any information would have improved the officer's understanding because they had done so little to corroborate or learn more about the incident they were now investigating and their failure to do so should not weigh against Professor Hayat.

In conclusion, although courts have found that facts needed to develop reasonable, articulable suspicion are less than probable cause, it is still required that officers develop "a 'particularized and objective basis for suspecting the particular person stopped of criminal activity'" that goes beyond an "'unparticularized suspicion or 'hunch.'" *Slocumb*, 804 F.3d at 682. In considering the totality of the circumstances, it is clear that defendant officers fell far short of acquiring reasonable, articulable suspicion at any point in this encounter and the district court's holding that officers' had reasonable, articulable suspicion while failing to make any precedent-based justification for their holding constitutes clear error and justifies reversal.

35

*D. The District Court Erroneously Concluded that the Facts it Considered Material to its Reasonable, Articulable Suspicion Analysis are Undisputed*

Even when confining the analysis to those facts that the district court deemed to be material, there remains a genuine dispute as to those facts. As the district court correctly stated, "if there clearly exist factual issues 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party,' then summary judgment is inappropriate." J.A. 280 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). After stating this standard, however, the district court proceeded to ignore it in its analysis, even when considering only the facts that the court itself deemed material.

First, the district court's claim that Officer Moran relayed a conversation with the original complainant that "confirmed…the description of the vehicle" is just wrong: Officer Moran relayed that the original complainant "saw the Black male open the trunk, yell at some kids, and close the trunk," giving no description of the vehicle at all. J.A. 300 at 00:04:39-00:04:55. Nor could Sergeant Diaz have known, as he approached the home, that the alleged black Tesla was "the plaintiff's vehicle." Thus, Officer Diaz did not have enough information to conclude that Professor Hayat drove a black Tesla.

Second, it is far from clear that when Sergeant Diaz approached the home, he knew that the reported car was on the premises. The Tesla was found in the garage.

36

J.A. 255.  Further, as Sergeant Diaz approached the home, he could not have seen the Tesla, which  remained parked in a garage behind a closed door. J.A. 301 at 00:00:31-00:00:48. From Sergeant Diaz's body-worn camera footage, it appears that the only car he could have seen was a white car in the driveway. J.A. 301 at 00:00:31-00:00:48. Nor did Sergeant Diaz attempt to discover whether the car he sought was anywhere on the premises. J.A. 52-53. Sergeant Diaz asked whether Professor Hayat had children and whether he had been to IHOP to connect Professor Hayat to the incident, but he never tried to connect Professor Hayat to the incident through the Tesla. J.A. 53. Based on this evidence in the record, district court erred in finding these facts undisputed.

Third, to the extent that Sergeant Diaz's opinions on evasiveness and deception can be regarded as facts, they are still disputed facts. In his sworn affidavit, Sergeant Diaz said that based on his expertise, the facts that Professor Hayat, in the Sergeant's opinion, seemed to anticipate his arrival; that Professor Hayat asked Professor Brown to enter the home; and that Professor Hayat would not invite Sergeant Diaz into the home to see his children created a reasonable suspicion of Professor Hayat, and the district court accepts this as the only reasonable conclusion. J.A. 54-55, 290-291.

However, according to the record, an experienced police officer with the same facts available to Sergeant Diaz could reasonably come to a very different

conclusion. Expert witness Russell Hicks is an experienced police officer. J.A. 178. Like Sergeant Diaz, Hicks worked at different times as a patrol officer, a plainclothes officer, and a narcotics officer. J.A. 51, 171. Afterwards, Hicks spent years training law enforcement officers. J.A. 170. After reviewing the information that Diaz had available to him, including the ECC recording, the training material provided to MCPD officers, the available body-camera footage, and Sergeant Diaz's own experience as testified to in deposition, Hicks concluded that there was no reasonable suspicion. J.A. 279-180, 197. Hicks concluded that a polite denial that a crime had occurred, a cordial decision not to answer questions, and an assertion of Constitutional rights are not suspicious. J.A. 201. Thus, there is a genuine dispute as to Sergeant Diaz reasonably considered Professor Hayat to be acting evasively or deceptively.

The district court was now left with only four undisputed facts: that a caller claimed to have seen a Black male yell at some children in a trunk; that a tag taken down by a caller had led Sergeant Diaz to this home; that Professor Hayat is a Black male; and that Professor Hayat did not invite Sergeant Diaz into the home to see the children. These facts cannot be articulated together in a manner that shows reasonable, articulable suspicion.

Since Sergeant Diaz could not see the car when approaching Professor Hayat's home, Sergeant Diaz had no reason to assume that Professor Hayat drove

the car – a necessary assumption to create reasonable, articulable suspicion that Professor Hayat committed the crime of kidnapping, as the district court claims Sergeant Diaz had – unless there were other identifying characteristics connecting Professor Hayat to the car. Based on the original complainant's description, the only characteristics that the driver of the car had were that he was Black, male, and had children. Unless the district court intended to rule that Sergeant Diaz had reasonable, articulable suspicion against *any* Black male who admits to having children, Sergeant Diaz did not, by the undisputed material facts, have reasonable, articulable suspicion to perform a *Terry* stop on Professor Hayat.

## IV. The Court Erred in Holding that Police May Enter a Home to Continue a *Terry* Stop Even in the Absence of Any Exigent Circumstances

In the district court's statement of law concerning how a *Terry* stop can be carried out where a suspect enters their home before being officially stopped, the district court stated the following: "Courts in this Circuit have recognized that the necessary elements to detain an individual pursuant to a Terry stop, where a suspect retreats into the home, are: (1) encountering a suspect outside a home; and (2) officers having reasonable, articulable suspicion of criminal activity prior to detainment." J.A. 283. This statement of law is incorrect, is inconsistent with this Circuit's precedent, and turns "the concept of a *Terry* stop into an all-powerful warrant exception permitting officers to enter a home and remove a family therein

39

on nothing more than reasonable suspicion." *Allotey v. Baltimore Cnty., Maryland*, 2022 WL 17105120, at *6 (D. Md., Nov. 22, 2022).

First, the district court misconstrued Fourth Circuit *Terry* stop and exigency case law concerning hot pursuit of a fleeing suspect to ground their unsupported statement of law. The court first attempted to base its statement of law on *Rivera v. Washington* and the section of *Allotey* discussing *Rivera*. *Rivera*, however, is factually distinct from the current case and merely holds that, where an officer clearly orders a suspect to wait for questioning in public, the suspect may not defy the order and avoid the stop by walking inside his home. 57 Fed. Appx. at 560. Thus, the *Rivera* Court never needed to address 1) whether a *Terry* stop occurred; 2) what would happen if a suspect is ordered to stop on their property as opposed to in public; or 3) what would happen if the suspect retreated into his home before being *Terry* stopped–three points at issue in this case. Although the *Rivera* court concluded that "courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home," the district court misconstrued the *Rivera* holding. *Id.* at 562.

Specifically, the district court relied on the Supreme Court's decision in *United States v. Santana* and various Fourth Circuit decisions interpreting it to answer one question: does exigency law justify the warrantless entry of a suspect's home where officers attempt to make a *Terry* stop but the suspect runs and retreats into their home such that officers are in hot pursuit of a fleeing suspect. *See Santana*,

427 U.S. at 42–43 (holding that defendant could not defeat a proper arrest by retreating into the home where officers had probable cause and were engaged in hot pursuit of a fleeing suspect); *Edwards v. United States*, 379 A.2d 976, 978 (D.C. 1977) (holding that suspect could not evade a *Terry* stop where lateness of hour, carrying of suspicious items, and flight from officers created probable cause for stop); *Harbin v. City of Alexandria*, 712 F. Supp. 67, 71–72 (E.D. Va. 1989) (holding that officers were justified in *Terry* stopping a suspect inside his home while they were outside after they pursued him believing he held a weapon).

In all the cases above, however, courts dealt with 1) situations where officers had probable cause or first-hand knowledge of a crime at issue; and 2) hot pursuit of a fleeing suspect, a particular exigency category. In *Santana* the officer's entrance into the home was based on 1) probable cause based on the suspect's past narcotics dealing and 2) pursuit of a fleeing suspect who the officers believed was going to destroy evidence. *Santana*, 427 U.S. at 42–43. Although *Edwards* was first decided on grounds of a *Terry* stop done pursuant to reasonable, articulable suspicion, on rehearing by the District of Columbia Court of Appeals, the court justified the officer's entrance into the home on probable cause instead. *Edwards*, 379 A.2d at 978. In *Harbin*, the officers 1) personally witnessed an individual brandishing a gun, 2) gave pursuit to the suspect after they ran, 3) knew the suspect was "a black male, 6′3″, wearing a blue jacket and blue cap" such as to limit identifying characteristics

of the suspect, and 4) never actually entered the victim's home. *Harbin*, 712 F. Supp. at 69.

Thus, the cited cases, at most, stand for the proposition that officers may enter a home to continue a *Terry* stop where 1) they are engaged in hot pursuit of a fleeing suspect, 2) officers have enough of a description of the suspect to reasonably limit the target of their search, and 3) the officers have first-hand knowledge of a crime prior to entering. This aligns with this Circuit's and other district courts' current understanding of *Terry* doctrine as well. *See United States v. Curry*, 965 F.3d 313, 323 (4th Cir., 2020) (explaining *Santana* in a parenthetical as holding that "exigent circumstances allowed warrantless entry into home when police were in 'hot pursuit' of fleeing suspect of fleeing suspect."); *United States v. Dupree*, 2013 WL 4499037, at *5 (D. Md. 2013) ("The majority of the cases cited by the government involved situations where the defendant fled and the police had reasonable suspicion to stop the defendant before the defendant 'retreated' into the house."). The district court's ruling erases 1) a clear exigent circumstance requirement and 2) a requirement that officers possess first-hand knowledge of an ongoing crime, omissions which create clear error in the district court's decision because they were not present in the facts of the instant case.

The failure of the district court to consider these additional elements is clear error since it is undisputed that neither element was present and thus there is at least

a genuine dispute of material fact concerning whether defendant officers were justified in entering Professor Hayat's home to continue a *Terry* stop if one even happened outside the home. Defendant officers never possessed first-hand knowledge of a crime like the officers did in *Santana* or *Harbin*. Respectively, in those cases the officers either learned from undercover police officers about an ongoing crime or personally saw a gun being brandished by a suspect. *Santana*, 427 U.S. at 38; *Harbin*, 712 F. Supp. at 69.

In the instant case, defendant officers never had specific information about the alleged ongoing crime and merely asserted that they were responding to a kidnapping but were unable to explain 1) whether the second party caller or original complainant even reported a kidnapping, 2) what the children they were "saving" looked like, 3) whether those children bore signs of harm or otherwise acted in a way consistent with being kidnapped, and 4) how the lone fact of a Black man yelling at his children in a public parking lot somehow translates into the crime of kidnapping. J.A. 42, J.A. 100, J.A. 102.

The district court erred by failing to consider exigent circumstances as a justification for the defendant officers' entry into Professor Hayat's home. Still, defendant officers did not enter Professor Hayat's home pursuant to exigent circumstances, as detailed in the following section.

43

**V. The District Court Erred in Resolving at Summary Judgment Disputed Questions of Fact About Whether Exigent Circumstances Existed to Justify Home Entry to Continue a *Terry* Stop**

The Supreme Court has adopted three exceptions to the warrant requirement to permit a police officer to enter a home. The first two are exigent circumstances, which apply in the context of investigating a crime — (1) to prevent the destruction of evidence and (2) to justify hot pursuit. The third, which applies outside of conducting a criminal investigation is (3) the emergency aid exception[4], which allows officers to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Kentucky v. King,* 563 U.S. 452, 459-62 (2011).

The emergency aid exception requires officers to show that they had an objectively reasonable basis, supported by specific facts and reasonable inferences, to believe that someone inside the home needs immediate aid due to an emergency

---

[4] This case implicates the emergency-aid exception—not the broader exigent-circumstances doctrine. Exigent circumstances excuse the warrant requirement only when officers have an objectively reasonable belief, grounded in specific, articulable facts and reasonable inferences, that probable cause exists and immediate action is required. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (warrantless entry permissible only when law-enforcement needs are so compelling that a warrantless search is objectively reasonable provided there is probable cause). Here, no probable cause finding was made, in fact, the district court only discussed reasonable suspicion in its analysis and decision. Where officers lack reasonable suspicion, this Circuit has held that the exigency must clear an even higher bar. *United States v. Curry*, 965 F.3d 313, 320 (4th Cir. 2020). Lastly, this opening brief does not discuss the "community-caretaking" rationale, which, after *Caniglia v. Strom*, 593 U.S. 194, 1599-1600 (2021), does not allow the community caretaking exception to extend to the home.

44

situation. *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013); *see also Michigan v. Fisher,* 558 U.S. 45, 47 (2009); *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). This exception is narrow, and only used to justify action where the circumstances in question are "enveloped by a sufficient level of urgency." *Yengel*, 711 F.3d at 397; *cf. Brigham City v. Stuart,* 547 U.S. 398, 403 (2006); *United States v. Hill,* 649 F.3d 258, 265 (4th Cir. 2011). Even a "possible homicide" on its own does not constitute an emergency justifying "immediate [warrantless] action." *Mincey*, 437 U.S. at 392.

In *Brigham City*, the officers heard the sound of an altercation originating from inside the home. *Brigham City*, 547 U.S. at 406. Through a window, officers observed a juvenile break free from an adult's restraint to punch another adult, who then spat blood into the sink. Only *then* did they enter the home. *Id*. Given the visible injury and potential for further harm, the court held it was "plainly reasonable" for the officers to enter the home and resolve the conflict because there was a reasonable basis that the injured adult needed help and that the altercation could escalate. *Id*. Similarly in *Michigan v. Fisher*, officers were called to a disturbance where they observed the risk themselves; through a window they saw the defendant behaving erratically, screaming and blocking off his front door with his couch. 558 U.S. at 46. The chaos and danger were apparent, and the Court again upheld a warrantless entry under the emergency aid exception. *Id.* at 48.

45

In contrast, the officers in this case had no objectively reasonable basis on which to justify an entry based on the emergency aid exception. Defendant officers arrived at a scene following an unverified tip from an anonymous second party caller who provided no physical description of the person of interest, except that he was a "Black male." J.A. 99.[5] The only additional information available at the time—aside from the information from the complainant—was that the second party caller was following the wrong vehicle, of which all officers were made aware before entering Professor Hayat's home. J.A. 42; J.A. 183.

This information—transmitted to Sergeant Diaz approximately five minutes before arriving at Mr. Hayat's home[6]—meant officers did not have an objectively reasonable basis to believe emergency aid was needed inside Mr. Hayat's home. The second party caller's characterization of the incident as a kidnapping could not have been relied upon because the second party caller was never identified and the defendant officers provided no additional facts to corroborate why they viewed this incident as a kidnapping. In fact, "officers are trained to scrutinize second party information and generally not make stops of individuals solely based on second hand

---

[5] Defendants were looking for a "Black man" with no information as to his height, weight, skin complexion, hair texture, hair length, or clothing. J.A. 116-118, 174.

[6] Sergeant Diaz's forceful entry into Mr. Hayat's home occurred four minutes and forty seconds after he was informed, for a second time, that Teslas have rear-facing seats.

46

information" because they relay misinformation and frequently turn out to be unreliable. J.A. 207. Given the caller's flawed account of this incident, the inability of officers to verify any of the information on which they relied, and police procedure that trains officers to question all information received from second party callers, the initial report does not provide an objectively reasonable basis on which officers could justify entry pursuant to emergency aid.

Although defendant officers did eventually meet with the original complainant to discuss the report, the information they learned about the children falls far below what justified the officers' entry into homes in *Fisher* and *Brigham City*, meaning entry pursuant to the emergency aid exception was unjustified here. After speaking with the original complainant, the defendant officers learned nothing about what the children looked like, unable to describe their "age … gender … height" or "race" or whether they had the kind of visible signs of injury or distress that justified entry in *Fisher* and *Brigham*. J.A. 100-103[7]; *see Brigham City*, 547 U.S. 398, 406 (2006); *Michigan v. Fisher,* 558 U.S. 45, 48 (2009).

Defendant officers also never knew of any chaos or violence that justified the entry into the home in *Fisher*. The most defendant officers ever knew about the situation was that a Black male yelled at unidentifiable children, not struggling or

---

[7] There was no information as to the children's age, gender, weight, height, clothing, or their race. J.A. 102-103, 163-164.

yelling themselves, who were in his car – in other words that a Black male may have lost his temper with his kids in public, as happens to harried parents everyday everywhere. J.A. 42. Thus, the original complainant's report also could not provide an objectively reasonable basis to enter a home based on the emergency aid exception.

In addition to the unreliable, unverifiable second party call and the factually deficient report of the original complainant, defendant officers also learned of more mitigating facts that should have dispelled an objective belief that a kidnapping was ongoing. It was relayed to all officers well before Sergeant Diaz entered Professor Hayat's home that Tesla models of the kind for which the officers were searching had legal, rear-facing seats in the trunk. J.A. 179. This information was relayed twice to all officers, and both transmissions of the information took place before Sergeant Diaz arrived at Professor Hayat's porch. J.A. 185.

Finally, the officers learned nothing more upon encountering Professor Hayat that would have provided them an objectively reasonable basis for entering his home. When Sergeant Diaz arrived at the scene and questioned Professor Hayat, he replied in "a calm, polite, and conversational tone …" J.A. 188. Referencing Sergeant Diaz's body camera footage, Professor Hayat "did not present himself as hostile, aggressive, or assaultive." J.A. 204. Rather, Professor Hayat was responsive to Sergeant Diaz's questions about there being children in the home and responded

48

to questions related to the kidnapping.[8] J.A. 301. There was no indication of injury or emergency within the home; instead, the lights inside were on, and there were no signs of distress—no crying, yelling, or screaming was heard, and no indicators of immediate or imminent injury were visible from outside the home. J.A. 67-69; J.A. 301 at 00:19:25 - 00:20:27.

Nor was the warrantless entry into Professor Hayat's home justified based on the emergency aid exception because officers were responding to a 911 call. In *Yengel*, officers responded to a domestic assault call involving a potential grenade in the home. 711 F.3d at 399. Despite the gravity of the call, upon the officer's entry into the home no preventative action was taken, such as evacuating the child or neighbors from their homes. *Id.* at 399. This Circuit held that the mere existence of a potential threat when combined with lack of action like evacuating the nearby child indicated that the officers did not perceive this threat as active, serious, or ongoing, thus invalidating their warrantless entry. *Id.*

Similarly, in our case, there was no indication of a serious injury or immediate danger that required immediate action on the part of the officers. Crucially, neither the original complainant—who presumably observed the incident firsthand—nor the second party caller, nor Officer Moran, who relayed the information, used the term

---

[8] Professor Hayat was not observed to be "yelling" as was improperly written in Officer Min's report. J.A. 58-59, 188.

49

"kidnapping" to refer to the incident. J.A. 42, 179. The absence of that language from the original complainant, second party caller, and responding officer cuts against any claim that officers were responding to an immediate threat. Upon entering the home, the officers immediately responded by restraining Mr. Hayat rather than checking on the children's welfare. J.A. 303. The officers, instead, repeated the same question—whether there were children and if they were "all right"—that had already been asked before forcefully entering. *Id.*

Because of the above, there is a genuine dispute of material fact about whether defendant officers had an objectively reasonable basis to justify warrantless entry into Professor Hayat's home. However, the district court wholly failed to discuss this issue and merely cited cases like *Brigham City* without explaining why they were relevant to a case where their application is clearly disputed.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment and remand for further proceedings.

Respectfully submitted,

/s/ Aderson B. Francois
Aderson B. François
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave NW, Suite 352
Washington, DC 20001

Laila Ahmed
Thomas Stanley-Becker
Yisroel Margolin
Douglas Wickman

Student Counsel

July 23, 2025                    *Counsel for Appellants*

51

**Request for Oral Argument**

Plaintiff-Appellant requests oral argument, which would significantly aid this Court's decisional process. This case involves  important questions regarding this Circuit's Fourth Amendment doctrine. Specifically, the district court's opinion relied upon as central authority an unpublished decision from this Circuit dating prior to 2003.  Inasmuch as this Court's Local Rule 32.1 disfavors the precedential use of pre-2003 unpublished opinions with respect to a material issue in a case unless no other published precedent would serve as well, oral argument will assist the Court in clarifying a) the factors that establish a Terry stop; and b) the factual circumstances under which law enforcement may enter a person's home absent consent, a warrant, or exigent circumstances.

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,109 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

/s/ Aderson B. Francois
Aderson B. Francois

*Counsel for Plaintiff-Appellant*
Fareed Hayat

June 23, 2025

53

**Certificate of Service**

I certify that on June 23, 2025, I electronically filed this Brief of Plaintiff-Appellant Fareed Hayat using the CM/ECF System, which will send notice of the filing to the following registered CM/ECF users: counsel for Defendants-Appellees Kathryn Lloyd, Kristen Nunley, and Aaron Ramirez.

/s/ Aderson B. Francois
 Aderson B. Francois

 *Counsel for Plaintiff-Appellant*
 Fareed Hayat

1