No. 25-1235

## IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

FAREED HAYAT,

*Plaintiff-Appellant*,

v.

SGT. CASEY DIAZ, *et al*,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the District of Maryland
(Lydia Kay Griggsby, Judge)

———————————

**APPELLEE BRIEF**

———————————

John P. Markovs, County Attorney    Executive Office Building
Edward B. Lattner, Dept. County Attorney    101 Monroe Street, Third Floor
Kristen J. Nunley, Asst. County Attorney    Rockville, MD 20850
Aaron Ramirez, Asst. County Attorney    240-777-6700
   Attorneys for Appellees

**TABLE OF CONTENTS**

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE CASE..........................................................................1

UNDISPUTED AND MATERIAL FACTS.......................................................3

ISSUE..............................................................................................................10

STANDARD OF REVIEW ..............................................................................11

ARGUMENT ...................................................................................................11

   I.    Entry Into the Residence Was Lawful Pursuant to a *Terry* Stop. .................11

      A.   General Principles Governing the Evasion of *Terry* Stops by Retreating Into a Residence. ...................................................................................13

      B.   Sergeant Diaz Encountered Mr. Hayat Outside the Residence..................14

      C.   There Was Reasonable, Articulable Suspicion of Criminal Activity Prior to Detainment. ...................................................................................20

   II.   Exigency is Not a Requirement to Pursue a Valid *Terry* Stop After a Suspect Retreats Into a Residence. ...................................................................30

   III.  Entry into the Residence was Justified to Check on the Welfare of the Children. ...................................................................................................33

   IV.  Alternatively, This Court Can Affirm Based on Appellees' Entitlement to Qualified Immunity. ...............................................................................36

   V.   This Court Cannot Consider Mr. Hayat's Unpreserved Arguments. ............38

CONCLUSION................................................................................................40

CERTIFICATE OF SERVICE .......................................................................41

# TABLE OF AUTHORITIES

*Allotey v. Baltimore Cnty., Maryland*, No. 1:21-CV-02288-JMC, 2022 WL 17105120 (D. Md. Nov. 22, 2022), *appeal dismissed sub nom. Allotey v. Becketts*, No. 22-2312, 2023 WL 4198891 (4th Cir. Jan. 11, 2023)....... 13, 18, 32

*Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006) .......................................... 13, 34

*Edwards v. U.S.*, 364 A.2d 1209 (1976)................................................. 13, 16, 17, 24

*Florida v. J.L.*, 529 U.S. 266 (2000)....................................................................22

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017).........................10

*Harbin v. Alexandria*, 712 F. Supp. 67 (E.D. Va. 1989) *aff'd*, 908 F.2d 967 (4th Cir. 1990)...................................................................................... 13, 15, 19, 23

*Heien v. North Carolina*, 574 U.S. 54 (2014)........................................................23

*Hicks v. Ferreyra*, 965 F.3d 302 (4th Cir. 2020)...................................................38

*In re Under Seal*, 749 F.3d 276 (4th Cir. 2014).....................................................38

*Maros v. Cure*, No. 6:21-CV-03346-JD-JDA, 2024 WL 1528518 (D.S.C. Jan. 24, 2024), *report and recommendation adopted*, No. 6:21-CV-3346-JD-JDA, 2024 WL 1152738 (D.S.C. Mar. 15, 2024)...............................................................13

*Martin v. Saint Mary's Dep't of Soc. Servs.*, 346 F.3d 502 (4th Cir. 2003)............11

*Michigan v. Fisher*, 558 U.S. 45 (2009) ...............................................................34

*Mincey v. Arizona*, 437 U.S. 385 (1978) ...............................................................13

*Reichle* v. *Howards*, 566 U. S. 658 (2012) ............................................................36

*Richardson v. Clarke*, 52 F.4th 614 (4th Cir. 2022) ..............................................38

*Rivera v. Washington*, 57 Fed. App'x 558 (4th Cir. 2003).....................................12

*Scott v. United States*, 328 F.3d 132 (4th Cir.2003)..............................................36

i

*Kansas v. Glover*, 589 U.S. 376 (2020) ....................................................................30

*Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) ........................................................36

*Stewart v. Hall,* 770 F.2d 1267 (4th Cir.1985) .........................................................38

*Terry v. Ohio*, 392 U.S. 1 (1968) .............................................................................20

*United States v. Curry*, 965 F.3d 313 (4th Cir. 2020), as amended (July 15, 2020),
    as amended (July 16, 2020) ..............................................................................32

*United States v. Glover*, 662 F.3d 694 (2011) ..........................................................28

*United States v. Arvizu*, 534 U.S. 266 (2002) ..........................................................21

*United States v. Brown*, 401 F. 3d 588 (4th Cir. 2005) ............................................22

*United States v. Dupree*, 2013 WL 4499037 (D. Md. Aug. 20, 2013)....................32

*United States v. Flores-Granados*, 783 F.3d 487 (4th Cir. 2015) ...........................36

*United States v. Gomez*, 495 F. Supp. 992, 997 (S.D.N.Y. 1979), *aff'd* 633 F.2d
    999 (2d. Cir. 1980), *cert. denied,* 450 U.S. 994 (1981) ......................................17

*United States v. Gray*, 883 F.2d 320 (4th Cir. 1989)...............................................20

*United States v. Peters*, 60 F. 4th 855 (4th Cir. 2023)..............................................22

*United States v. Rogers*, 8 F. App'x 173 (4th Cir. 2001) .........................................19

*United States v. Santana*, 427 U.S. 38 (1976) .........................................................31

*United States v. Slocumb*, 804 F.3d 677 (4th Cir. 2015) ..........................................21

*United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013) .............................................35

**Constitutional Provisions, Statutes, Ordinances, Rules, and Regulations**

**United States Constitution**

Fourth Amendment ..................................................2, 15, 16, 17, 19, 31

**United States Code**

42 U.S.C. § 1983.................................................................................1, 2

**Federal Rules**

Fed. R. Civ. P. 56................................................................................11

## STATEMENT OF JURISDICTION

This case is an appeal by Plaintiff-Appellant Fareed Hayat from a final decision of the United States District Court for the District of Maryland, granting summary judgment in favor of Defendants-Appellees and dismissing Mr. Hayat's Amended Complaint.

## STATEMENT OF THE CASE

On October 15, 2020, Mr. Hayat initiated this matter in the United States District Court via a Complaint against Chief of Police Marcus Jones, four named Montgomery County Police Department ("MCPD") officers, ten unnamed Doe MCPD officers and Montgomery County, Maryland, (collectively the "County"). In his Complaint,[1] Mr. Hayat alleged the violation of his rights pursuant to 42 U.S.C. § 1983 and Maryland law arising out of MCPD's interaction with him during an investigation into a reported kidnapping. J.A. 23-40.

Mr. Hayat claimed that on October 22, 2017, during the course of MCPD's priority response to a reported kidnapping of children outside of an IHOP restaurant, Sergeant Diaz and Officer Min forced their way into Mr. Hayat's residence, tackled him, handcuffed him and "smashed their knees into Mr. Hayat's spine[.]" J.A. 27 ¶¶

---

[1] The operative complaint (Amended Complaint) was filed on February 17, 2021. *See* ECF No. 19, J.A. 23.

1

25, 31. Mr. Hayat sought compensatory damages, punitive damages and attorney's fees and costs. J.A. 39-40 at Prayer for Relief.

Following the County's Partial Motion to Dismiss the Amended Complaint, *see* ECF No. 32, the District Court entered an Order which dismissed multiple counts of the Complaint. *See* ECF No. 35. The Court further bifurcated Mr. Hayat's *Monell* Claim against the County and Chief Jones in Count IV of the Amended Complaint for discovery and trial.[2] *See* ECF No. 51.

Upon the conclusion of discovery, the District Court granted the County's Motion for Summary Judgment as to all remaining claims,[3] and dismissed the Amended Complaint through a Memorandum and Order dated February 12, 2025. J.A. 271. Mr. Hayat timely appealed on March 11, 2025. J.A. 298.

---

[2] The District Court dismissed: Counts I (Battery), II (Trespass), III (False Imprisonment), VI (Violation of 14th Amendment Right to Familial Privacy) and VII (Violation of Property Rights) in their entirety; any 14th Amendment claim raised in Count IV (Violation of Fourth Amendment Rights - 42 U.S.C. § 1983); all official capacity claims with respect to Sergeant Diaz, Officer Dolan, Officer Min, and Officer Lenhart; and claims for monetary relief of any kind in their official capacities against Sergeant Diaz, Officer Dolan, Officer Min, Officer Lenhart, Police Chief Marcus Jones, and Montgomery County. *See* ECF No. 35.

[3] The remaining claims included: Count IV, Violation of Fourth Amendment Rights - 42 U.S.C. § 1983, against Sergeant Diaz (individual capacity), Officer Dolan (individual capacity), Officer Min (individual capacity), Officer Lenhart (individual capacity), Chief Marcus Jones (official capacity), Montgomery County, and Does 1-10; and Count V, Violation of Md. Decl. of Rights Articles 24 and 26, against Sergeant Diaz (individual capacity), Officer Min (individual capacity), Officer Dolan (individual capacity), Officer Lenhart (individual capacity), Montgomery County, and Does 1-10.

2

The only issue before this Court is whether the District Court erred in granting summary judgment to the County. Because the Court did not err, this Court should affirm.

## UNDISPUTED AND MATERIAL FACTS

### A. The Kidnapping Report

On October 22, 2017, at 8:09 p.m., the Emergency Communications Center ("ECC") issued a priority call over the radio to MCPD Officers for the kidnapping of children outside of an IHOP in Silver Spring, Maryland. J.A. 41, J.A. 45, J.A. 300. The ECC dispatcher advised the MCPD Officers to "respond priority for a kidnapping" in the area of Piney Branch Road and University Blvd. J.A. 300 at 00:00:18-28. ECC also advised that the "complainant was told by another driver that he saw someone grab three children and put them in the trunk of a vehicle." *Id.* at 00:00:29-36. The ECC then provided a description of the vehicle of the suspect, stating, "[a] suspect vehicle, black, [license plate number], driven by a black male, northbound university towards Wheaton, unknown location in route." *Id.* at 00:01:19-32.

MCPD Sergeant Robert Sheehan reported over air that "the car comes back to a 2013 Tesla, to a black male, 1 Eastmoor Drive in Silver Spring." *Id.* at 00:02:03-10. No other information was provided regarding the owner of the vehicle at this time. *Id.* MCPD Officer Moran also stated over air that: "Teslas have rear-facing

3

seats in the trunk, so they might be able to sit there." *Id.* at 00:02:40-47.

The information regarding the alleged kidnapping was provided to 911 by a second party caller who identified himself as "Luis," and said that he was relaying information from the original complainant, who was later identified as Edgar Ayala Solano. J.A. 42, J.A. 300 at 00:01:45. The license plate was matched to a black Tesla registered to an address of 1 Eastmoor Drive in Silver Spring, Maryland. J.A. 45, J.A. 300 at 00:02:03-10. "Luis" identified the suspect as a black male but provided no further information. J.A. 300 at 00:01:19-32.

Soon after the 911 call, Officer Moran advised that he had made in-person contact with the original complainant, Mr. Ayala Solano:

> I have the original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and then close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal.

*Id*. at 00:04:28-50. Mr. Ayala Solano told Officer Moran that he observed the suspect "tie up children[.]" J.A. 48 at 12:18.

MCPD officers were dispatched priority to 1 Eastmoor Drive, Silver Spring, Maryland ("the Residence") in response to the 911 call, which was the address that was associated with the registered owner of the vehicle, based upon the license plate number. J.A. 52 at ¶ 8.

**B. The Investigation**

Sergeant Diaz was the first to arrive at the Residence. J.A. 52 at ¶ 9. At this

time, Sergeant Diaz had 12 years of experience as a patrol officer, as well as experience serving on the Special Assignment Team in a plainclothes investigative unit and on the Special Investigations Division, specializing in drug trafficking. *Id*. at ¶¶ 5 and 6. Sergeant Diaz had further specialized training in conducting interviews and interrogations, including signs of deception, and had conducted over 200 interviews as part of his various assignments. *Id*. at ¶ 6.

Sergeant Diaz responded to the Residence with his police cruiser lights and sirens on, but he turned off the lights and sirens before approaching the Residence to avoid alerting the subjects of his presence. *Id*. at ¶ 9. After Sergeant Diaz parked his police cruiser, he walked up the driveway of the Residence and observed an unknown black male and female, later identified as Mr. Hayat and his then-wife, Norrinda Hayat, standing on the steps outside of the Residence. *Id*. at ¶ 10. Sergeant Diaz believed that the male subject matched the limited description of the subject provided by the 911 caller. *Id*. at ¶ 11.

Sergeant Diaz noted that the individuals standing outside the Residence did not appear surprised by his arrival. *Id*. Based on his knowledge, training and experience, and given that the residents of the household had not requested police assistance, and especially given that he had turned off his cruiser's lights and sirens, Sergeant Diaz found it suspicious that the individuals appeared to anticipate his arrival because they were standing outside of the residence seemingly expecting him.

5

*Id.* at ¶ 12. Accordingly, Sergeant Diaz suspected that the individuals may have knowledge regarding the reported kidnapping or that they were attempting to conceal activity within the household, or both. *Id*. at ¶ 13; *see also* J.A. 58 at 142:18-20.

Sergeant Diaz approached the Residence, and Mr. Hayat and Mrs. Hayat, and the following exchange occurred as captured on his body worn camera:

**Sgt. Diaz:** "Hi, how are you doing? Everything okay here?"

**Hayat:** [indiscernible]

**Sgt. Diaz:** "Were you guys just at the IHOP down in Langley Park?"

**Hayat:** "What's the problem?"

**Sgt. Diaz:** "We got a call of a kidnapping, or something like that, were you guys down at the IHOP?"

**Hayat:** "There is no kidnapping here, sir."

**Sgt. Diaz:** "What's that?"

**Hayat**: "There is no kidnapping here, sir."

**Sgt. Diaz:** "Okay, well I just need to make sure everybody is ok."

**Hayat:** "Okay…how are you going to do that?"

**Sgt. Diaz:** "Well, we are talking. We are talking."

6

**Hayat:** "Everything is ok here."

**Sgt. Diaz:** "Well, I need to check. Are there any kids here?"

**Hayat:** "Yes."

**Sgt. Diaz:** "Okay. Well, can we see them?"

**Hayat:** "You cannot come into our house. We are both lawyers. I am a professor at the University of Howard, she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home."

[Overheard in the background] **Mrs. Hayat**: "I am a professor of law."

**Sgt. Diaz:** "Can you come down here for a second?"

**Hayat:** "I cannot."

**Mrs. Hayat:** "Can you explain to us what is going on here?"

**Sgt. Diaz:** "Yeah, somebody saw something involving some kids at an IHOP. . . "

J.A. 61, J.A. 301 at 00:00:38-00:01:36. After this exchange, Mr. Hayat cut off the conversation, ushered Mrs. Hayat into the Residence, and began to shut the door, while saying, "Norrinda, walk into our home please. Walk into our home. If you would like to come into our home without a warrant. . ." *Id.*

7

## C. Entry into the Residence

Mr. Hayat cut off Mrs. Hayat's conversation with police and ushered her back into the house, but Sergeant Diaz prevented Mr. Hayat from shutting the door and gave multiple commands for Mr. Hayat to open the door. J.A. 301 at 00:01:30-47, J.A. 55 at ¶ 20. Officer Min arrived and assisted Sergeant Diaz in attempting to open the door. J.A. 301 at 00:01:41-47. Mr. Hayat physically resisted by pushing back against the door, while yelling "you are not allowed in our house." *Id.*

Sergeant Diaz states in his sworn Affidavit that, based on his knowledge, training, and experience, he found it suspicious that Mr. Hayat stopped Mrs. Hayat from speaking and ushered her inside the Residence. J.A. 54 at ¶ 16, J.A. 59 at 146:3-9. Sergeant Diaz testified during his deposition that he believed Mrs. Hayat could have had information as to the welfare of the children and what occurred at the IHOP. J.A. 59 at 146:3-9.

Sergeant Diaz also states that because Mr. Hayat would not acknowledge whether he had been at the IHOP, he believed that Mr. Hayat's responses to questions were evasive and showed signs of deception. J.A. 54 at ¶ 17. After Sergeant Diaz told Mr. Hayat that he was investigating a reported kidnapping at the IHOP, Mr. Hayat was not surprised and did not deny that he had been at the IHOP, but avoided the question, answering only "there is no kidnapping here." *Id.* Sergeant Diaz also found it suspicious that Mr. Hayat seemed particularly concerned about

8

Mrs. Hayat learning details about the kidnapping report that he was trying to share with her. *Id.*

Mr. Hayat's demeanor was defensive and evasive throughout the whole encounter, based on Sergeant Diaz's observations of Mr. Hayat's posture, body language and tone of voice. *Id.* Sergeant Diaz states in his sworn Affidavit that Mr. Hayat became more defensive and tried to use his background as a law professor to deflect Sergeant Diaz's questions. *Id.* at ¶ 18. Mr. Hayat also told Sergeant Diaz that he could not enter the Residence, even though Sergeant Diaz had neither attempted nor requested to do so. *Id.*

Sergeant Diaz found it suspicious that Mr. Hayat became agitated and ushered Mrs. Hayat into the Residence when Mrs. Hayat asked Sergeant Diaz to explain why he was there. *Id.* at ¶ 17, 19. Sergeant Diaz believed that Mr. Hayat's conduct prevented him from speaking with Mrs. Hayat and learning any potential information she may have had that was relevant to the investigation. *Id.*

Sergeant Diaz states that, based on the totality of his observations and known information at the time, he believed that children were inside the Residence who were in immediate threat of serious danger. *Id.* at ¶ 20.

**D. Conclusion of Investigation**

Sergeant Diaz and Officer Min gained entry to the Residence. J.A. 64, J.A. 303 at 00:00:00 – 00:00:20. Once inside, Mr. Hayat repeatedly yelled at the Officers,

screaming that he was an attorney and that they could not be in his home. *Id*. Mr. Hayat resisted the Officers' efforts to gain control of his arms and to handcuff him. J.A. 68-70. It is undisputed that no strikes, hits, punches, kicks, or weapons were used against Mr. Hayat.[4] J.A. 55 at ¶ 21, J.A. 62 at ¶ 7, J.A. 80 at ¶ 14, J.A. 82 at ¶ 8.

Mr. Hayat's brother arrived at the scene where he provided the children's names and confirmed that he had just seen one child inside the home. J.A. 302 at 00:01:30-00:02:09. Mrs. Hayat thereafter confirmed that Mr. Hayat and her children had been at the IHOP and allowed the Officers to observe the children and determine that they appeared okay. *Id.* at 00:02:55, 00:02:58, and 00:04:51. MCPD determined that a kidnapping had not occurred, and the Officers left the scene. J.A. 55 at ¶ 22. Sergeant Diaz testified that he filed a report with Maryland Child Protective Services after the incident because he thought "it was significant enough that there was, you know, an incident at the IHOP that somebody was able to interpret as a kidnapping." J.A. 60 at 182:3-5.

---

[4]    Mr. Hayat's opening brief does not address the District Court's finding that the officers' use of force was reasonable. J.A. 292. As such, any argument on appeal regarding the officers' use of force is waived. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (internal quotations omitted).

10

## ISSUE

Did the District Court err in granting summary judgment to the County and dismissing the Amended Complaint?

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *See Martin v. Saint Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 505 (4th Cir. 2003). The moving party is entitled to summary judgment only if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a).

## ARGUMENT

The District Court did not err in granting summary judgment to Appellees because the undisputed material facts show that the officers had reasonable, articulable suspicion to conduct an investigatory stop before Mr. Hayat attempted to retreat into the Residence. As such, the Court was correct in finding that the warrantless entry into the Residence pursuant to a valid *Terry* stop was lawful and this Court should affirm.

## I.    Entry Into the Residence Was Lawful Pursuant to a *Terry* Stop.

Mr. Hayat argues that the District Court incorrectly assumed that Sergeant

11

Diaz initiated a *Terry* stop of Mr. Hayat outside the Residence.[5] *See* Appellant's Br. at 14. According to Mr. Hayat, "[a]t no point during the interaction did Sergeant Diaz show any sign of 'authority' suggesting that the Hayats could not re-enter their home." *See* Appellant's Br. at 15.  Mr. Hayat further argues that even if a *Terry* stop was initiated outside the Residence, it was not supported by reasonable, articulable suspicion. *See* Appellant's Br. at 22.

To the contrary, the record shows, and the District Court properly found, that Sergeant Diaz encountered Mr. Hayat outside the Residence, and initiated a seizure pursuant to a *Terry* stop when he prevented Mr. Hayat from closing the door.[6] J.A. 55, J.A. 292, J.A. 301. Additionally, Sergeant Diaz had reasonable, articulable suspicion that a crime was being committed before he prevented Mr. Hayat from closing the door. As such, the District Court properly found that entry into the

---

[5] The County rejects Mr. Hayat's repeated characterization of the District Court's legitimate legal and factual findings as "assumptions." *See* Appellant's Br. at 2, 3, 14, 31, and 39.

[6] Footage from Sergeant Diaz's body camera clearly shows that Mr. Hayat was not able to shut his door (Sergeant Diaz's right hand can be seen stopping the door from shutting). J.A. 301 at 00:01:40, J.A. 293 ("First, the body-worn camera evidence and the undisputed facts make clear that, before the Defendant Officers entered the Residence, the Plaintiff attempted to physically shut the door of the Residence to impede the Defendant Officers from continuing their investigation into the report of a kidnapping of children. ECF No. 78-3. Immediately after this occurred, Sergeant Diaz and Officer Min proceeded to open the door and to enter the Residence."). Officers used force to stop Mr. Hayat from shutting the door, while commanding him to open the door. J.A. 42, J.A. 55 at ¶ 20.

Residence was lawful, and this Court should affirm.

## A.     General Principles Governing the Evasion of *Terry* Stops by Retreating Into a Residence.

An individual may not evade a lawful *Terry* stop by retreating into a residence. *See Rivera v. Washington*, 57 Fed. App'x 558, 562 (4th Cir. 2003); *see also Harbin v. Alexandria*, 712 F. Supp. 67 (E.D. Va. 1989) *aff'd*, 908 F.2d 967 (4th Cir. 1990); *Maros v. Cure*, No. 6:21-CV-03346-JD-JDA, 2024 WL 1528518, at *7 (D.S.C. Jan. 24, 2024), *report and recommendation adopted*, No. 6:21-CV-3346-JD-JDA, 2024 WL 1152738 (D.S.C. Mar. 15, 2024); *c.f. Allotey v. Baltimore Cnty., Maryland*, No. 1:21-CV-02288-JMC, 2022 WL 17105120, at *6 (D. Md. Nov. 22, 2022), *appeal dismissed sub nom. Allotey v. Becketts*, No. 22-2312, 2023 WL 4198891 (4th Cir. Jan. 11, 2023) (finding officers' entry into home was not lawful because suspects were inside residence when encounter began).

Courts in this Circuit recognize that the necessary elements to detain an individual pursuant to a *Terry* stop where a suspect retreats into a residence are: (1) encountering a suspect outside the residence; and (2) officers having reasonable, articulable suspicion of criminal activity prior to detainment. *See Allotey*, 2022 WL 17105120, at *6; *Harbin*, 712 F. Supp. at 71-72; *see also Edwards v. U.S.*, 364 A.2d 1209, 1214 (1976). Additionally, the Supreme Court has held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City,*

13

*Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'") (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

**B.**    **Sergeant Diaz Encountered Mr. Hayat Outside the Residence.**

Mr. Hayat argues that Sergeant Diaz did not initiate a *Terry* stop outside the Residence because Sergeant Diaz did not issue a command while they were conversing prior to Mr. Hayat's reentry. *See* Appellant's Br. at 14, 17. Mr. Hayat is incorrect. Sergeant Diaz encountered Mr. Hayat outside the Residence and then, after developing reasonable, articulable suspicion, followed Mr. Hayat's retreat toward the Residence. Sergeant Diaz temporarily detained Mr. Hayat pursuant to a *Terry* stop when he seized him by preventing Mr. Hayat from closing the door. This conclusion is supported by case law from this Court and others which have provided guidance as to what particular facts satisfy the first requirement that the encounter with the suspect begins outside the residence.

In *Rivera*, police officers were called to investigate a domestic dispute at an apartment complex parking lot. 57 Fed. Appx. 558, 560 (2003). Upon arriving at the scene, and while standing in the parking lot, an officer ordered one of the appellants to stand by. *Id*. However, the appellant disregarded the order and retreated into the back door of the apartment. *Id*. The officer then followed the appellant to the back door and when the appellant would not comply with the officer's oral request to

14

leave the apartment, the officer entered the apartment. *Id*. This Court held that the officer's entry was lawful because the appellant could not "avoid a *Terry* stop simply by retreating into a home." *Id*. at 562. Thus, where the encounter begins outside a residence and officers have reasonable, articulable suspicion, officers can lawfully go inside to conduct a *Terry* stop even where a suspect refuses to come outside.

In *Maros*, an officer suspected that an individual referred to as "Kaiser" whom she had previously encountered may have been involved in a reported shoplifting. 2024 WL 1528518, at *2. The officer approached Kaiser's residence at which point Kaiser emerged from the front door and a conversation between the two began. *Id*. As part of the conversation, the officer began reading Kaiser his rights, but Kaiser turned to retreat into the residence. *Id*. The officer grabbed Kaiser's shirt, told him not to go inside, and followed him into the residence as he continued moving. *Id*. The court determined that the officer's entry into the residence did not violate the Fourth Amendment because of the valid ongoing *Terry* stop. *Id*. at 4. Thus, where an officer has reasonable, articulable suspicion, and physically grabs the person and commands them to stop while crossing the threshold of the residence, the *Terry* stop is justified despite intrusion into the residence.

In *Harbin*, police officers were on patrol when they received a report that a suspect had been seen brandishing a gun in the vicinity of a 7-Eleven. 712 F. Supp. at 69. Officers pursued a man who might have matched the description of the suspect

15

as he walked along a sidewalk and then onto the front porch of a residence. *Id*. at 70. As the man crossed the threshold of the residence and entered into the living room, one officer who was approximately 15-20 feet away called out through the open door and ordered the man to stop, which he did. *Id*. The court found that the man "was 'stopped' by [the officer]'s call immediately after crossing from the porch of his house through the front door into his living room." *Id*. at 72. This did not amount to a Fourth Amendment violation because an otherwise valid *Terry* stop cannot be thwarted "merely because a suspect crosses from the porch of his house to the living room through a still open door." *Id*. Thus, when an officer follows a man walking outside and issues a command to stop after the man crosses the threshold of the door and the door remains open, the *Terry* stop permits entry into the residence.

In *Edwards*, two plain-clothed officers in an unmarked car noticed the appellant and co-defendant walking on the street carrying items that appeared suspicious to police. 364 A.2d at 1211. One of the officers rolled down the window and attempted to speak to the men and notify them that he was a police officer, but the officer was not sure the men heard him. *Id*. The officer left the car and followed the men on foot but did not call out to them again. *Id*. The men ran up a flight of stairs and pushed open an apartment door. *Id*. The officer was five or six steps behind the men and saw that while the "apartment door had come back[,]" it "hadn't been completely closed" and "hadn't made connection with the facing around it to lock

16

it." *Id*. at 1212. The officer followed the men into the apartment. *Id*. The court determined that the officer's entry into the apartment was lawful as the officer first tried to question the men outside on the street and then the men attempted to thwart a valid *Terry* stop by gaining entry to the apartment before the pursuing policeman only a few strides behind could catch them. *Id*. at 1214. Thus, when an officer attempts to question a person based on reasonable, articulable suspicion and that person then retreats into a residence by closing but not locking the door, the officer is justified following the suspects inside the residence pursuant to a *Terry* stop.

Finally, in *United States v. Gomez*,[7] officers observed a suspect on the street and developed reasonable, articulable suspicion that he was engaging in a narcotics transaction. 495 F. Supp. 992, 997 (S.D.N.Y. 1979), *aff'd* 633 F.2d 999 (2d. Cir. 1980), *cert. denied*, 450 U.S. 994 (1981). The suspect entered an apartment building and officers followed but did not attempt to stop the suspect prior to entering the building. *Id*. As the suspect was walking over the threshold of an apartment door, the officers yelled "police" as they ran toward the door, but "[t]he door was slammed just as they reached it." *Id*. Officers knocked on the door, banged on the door and kicked the door while requesting that the door be opened for "seven to ten minutes" until a different occupant opened the door and officers entered the apartment. *Id*.

---

[7] *United States v. Gomez* was relied upon, and cited with approval, by this Court in *Rivera v. Washington*. 57 Fed. Appx. at 562.

The Court noted that *Terry* authorizes an officer to pursue a suspect once he retreats and such pursuit is not unlawful "merely because it began in the street and ended in the apartment." *Id.* at 1005 (citing *Edwards*, 364 A.2d at 1214-15). The Court held that the officers' "continued pursuit of the suspects after they retreated and slammed the door did not contravene the Fourth Amendment." *Id.* Thus, when an officer develops reasonable, articulable suspicion by observing a suspect on the street, then the suspect retreats into a residence, slams the door and officers knock, pound and kick the door for seven to ten minutes before gaining entry, such entry is justified pursuant to a *Terry* stop.

In contrast, in *Allotey*, police officers were called to investigate an alleged burglary at a townhouse. 2022 WL 17105120 at *1. Officers arrived at the townhouse to find it dark, with no signs of forced entry and no sounds of struggle or violence within. *Id.* at *2. Without knocking, and with handguns drawn, officers yelled to open the door and when the family inside opened the door, an officer entered the townhouse. *Id.* The court determined that entry into the townhouse was not lawful; there was no ongoing *Terry* stop because the family was inside the townhouse when the encounter began. *Id.* at *6. Thus, where an officer's initial encounter with a person is while they are already inside, entry into the residence is not justified pursuant to an ongoing *Terry* stop.

18

The cohesive framework illustrated in these cases is that when police encounter a suspect outside, and develop the requisite reasonable, articulable suspicion, it is legally permissible for police to follow the suspect's retreat into a residence pursuant to a *Terry* stop regardless of whether the door to the residence is open, partially shut, or even completely shut.

The facts of the instant case most closely mirror the facts of *Maros* and *Harbin* because the encounter with police began outside the Residence, then Mr. Hayat attempted to end the investigation by retreating into the Residence and the seizure pursuant to the *Terry* stop initiated *at the threshold of the door* when Mr. Hayat attempted to close the door and officers prevented him from doing so. *See Maros*, WL 1528518 at *2 (lawful entry where officer met man outside the residence then grabbed the man's shirt as he reentered at the threshold of the door and followed him inside while ordering him to stop); *Harbin*, 712 F. Supp. at 72 (lawful entry where officer observed man outside walking but did not engage with man until he had crossed the threshold of the door to the residence and ordered him to stop through open door).

Mr. Hayat argues that his encounter with Sergeant Diaz was "a wholly voluntary conversation, not a *Terry* stop" and "[a] reasonable person from the perspective of the Hayats would not conclude that, having a conversation with a police officer, meant they were seized pursuant to a *Terry* stop and were not free to

19

leave."[8] *See* Appellant's Br. at 15. Mr. Hayat is correct that the encounter outside began as a voluntary conversation. However, a seizure pursuant to a *Terry* stop occurred at the threshold of the door when Sergeant Diaz pursued Mr. Hayat's retreat and prevented him from closing the door of the Residence. *See United States v. Gray*, 883 F.2d 320, 322-23 (4th Cir. 1989) (a "show of authority" is "sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way" when an officer attempts to block a person's departure).

The District Court agreed that Sergeant Diaz encountered Mr. Hayat outside before Mr. Hayat retreated into the Residence, *see* J.A. 288-89, and this Court should affirm that finding.

## C.      There Was Reasonable, Articulable Suspicion of Criminal Activity Prior to Detainment.

Mr. Hayat argues that the *Terry* stop was not supported by reasonable articulable suspicion. *See* Appellant's Br. at 22. Specifically, he contends that there are genuine disputes of material fact because 1) the tip was neither reliable nor corroborated, and 2) his conduct and behavior on the porch could not have provided reasonable, articulable suspicion. *See* Appellant's Br. at 23-30.

---

[8] Mr. Hayat further argues that a person in Mr. Hayat's position, who is trained in Fourth Amendment case law, would have understood that he was free to leave. *See* Appellant's Brief at 15. Mr. Hayat's subjective belief is not the standard here. *See United States v. Rogers*, 8 F. App'x 173, 174 (4th Cir. 2001).

20

Mr. Hayat is incorrect. There are no disputes of material facts, and the District Court correctly found that Sergeant Diaz had reasonable, articulable suspicion of criminal activity prior to Mr. Hayat's attempt to retreat into the Residence.

## 1. Standard for Reasonable, Articulable Suspicion.

Reasonable suspicion is suspicion based on "specific and articulable facts . . . taken together with rational inferences from those facts[.]" *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This objective standard examines the reasonableness of police action based on the facts available to the officer at the time. *Id*. at 21-22. Courts look at the totality of the circumstances to determine whether an officer had reasonable suspicion of criminal activity. *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015). Facts which may be "susceptible to innocent explanation" on their own, can still "suffice[ ] to form a particularized and objective basis" for reasonable, articulable suspicion when viewed together. *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

## 2. The Eyewitness Report Conveyed to Sergeant Diaz Provided Reasonable, Articulable Suspicion.

Mr. Hayat argues that the kidnapping report and description of the suspect did not provide reasonable, articulable suspicion because the report did not bear sufficient indicia of reliability. *See* Appellant's Br. at 23. This is incorrect. Sergeant Diaz had reasonable, articulable suspicion of criminal activity based upon an eyewitness's belief that children were in danger and had been kidnapped.

21

The undisputed facts show that by the time Sergeant Diaz reached the Residence, Officer Moran had relayed over the radio that he had spoken directly to the original complainant, Mr. Ayala Solano. J.A. 48. Sergeant Diaz, who was "3 Henry 10," acknowledged his receipt of this information over the radio. J.A. 46, J.A. 251. Mr. Ayala Solano confirmed to Officer Moran that he had been at the IHOP where he observed a black male "open a trunk, tie up children inside, yell at them and slammed and shut before driving off." J.A. 48 at 12:16-20, J.A. 300 at 00:04:25-50. Mr. Ayala Solano was the first party caller who had provided the license plate information, which police found registered to Mr. Hayat's Residence. J.A. 42, J.A. 52 at ¶ 8, J.A. 300 at 00:00:19 - 02:10.

Mr. Hayat contends that the District Court erred because "it failed to analyze the reliability of the tip made" and "never discussed whether defendants further questioned the original complainant about the basis for his belief that these children were in danger[.]" *See* Appellant's Br. at 24. To bolster his argument, Mr. Hayat relies on factually inapposite cases that this Court should disregard.

In *United States v. Brown*, 401 F. 3d 588 (4th Cir. 2005),[9] this Court held that

---

[9] Mr. Hayat also cites *Florida v. J.L.*, 529 U.S. 266 (2000) for the proposition that Mr. Ayala Solano's report was unreliable. However, in that case the "officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an *unknown location* by an *unknown caller*." *Id*. at 270. Here, the eyewitness was not anonymous, and Officer Moran conveyed his conversation with the eyewitness to Sergeant Diaz.

police officers did not have reasonable articulable suspicion that Mr. Brown illegally possessed a firearm based solely on an "anonymous telephone tip" without also observing conduct by Mr. Brown that would cause them to suspect that he was carrying a firearm. *Id.* at 596. Differently here, the tip was not anonymous but verified by the original complainant; it was also coupled with Sergeant Diaz's observations of Mr. Hayat's conduct discussed *infra*.

In *United States v. Peters*, 60 F. 4th 855, 866 (4th Cir. 2023), this Court held that police officers did not have reasonable, articulable suspicion to seize Mr. Peters based on a tip that Mr. Peters sold drugs when the officer testified that the reason he seized Mr. Peters was for suspected trespass and not drug-related activity. Differently here, based on the tip related to a suspected kidnapping, Sergeant Diaz went to Mr. Hayat's residence to investigate that suspected kidnapping and observed Mr. Hayat for himself before entering the Residence. Mr. Hayat's reliance on these factually inapposite cases is misplaced.

As to Mr. Hayat's argument that officers should have further questioned Mr. Ayala Solano about why he thought a crime was occurring involving the children, *see* Appellant's Br. at 25, he provides no authority to show that officers are required to undertake such an interrogation when a kidnapping has been reported. Mr. Hayat's suggestion that the officers here needed "more concrete knowledge" and should have confirmed that "a true kidnapping was occurring" is absurd. *See* Appellant's Br. at

23

26. Reasonable, articulable suspicion is by definition "reasonable," allowing for leeway for officers to enforce the law in protection of the community. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) (seizures based on a mistake can still be "reasonable").

Finally, Mr. Hayat's additional contentions, such as Tesla having rear-facing seats, a second party caller following the wrong vehicle, or a limited description for the owner of the Tesla, *see* Appellant's Br. at 24-28, demonstrate continued misunderstanding of the standard for reasonable, articulable suspicion.

In *Harbin*, for example, the suspect was lawfully detained for a *Terry* stop, even though the suspect's description (wearing a blue jacket and wool cap) did not match the person detained (wearing a gray and black jacket with no cap). *See* 712 F. Supp. at 69, 71 ("[t]he minor discrepancies between the suspect's reported characteristics and those of the plaintiff are far too slender a reed on which to base a constitutional violation").

In *Edwards*, police had reasonable suspicion to stop a suspect who was carrying a stand, tape recorder, pillowcase, and other items late at night on a public street without a report of a recent crime, any lookout description, or even alleged missing property. 364 A.2d at 1211-14. The reasonable suspicion standard does not require substantial evidence of a crime and allows officers to effectuate a *Terry* stop despite minor inaccuracies in the suspect's description.

24

Here, the undisputed facts show that Mr. Ayala Solano's first-hand report of a black male suspected of kidnapping children at an IHOP was corroborated through the police's investigation. The license plate provided by Mr. Ayala Solano was registered to Mr. Hayat's address and Sergeant Diaz then found Mr. Hayat, a black male, at that address. J.A. 42, J.A. 52 at ¶ 8, J.A. 300 at 00:02:03-10.

Mr. Hayat confirmed to Sergeant Diaz that children were in the house. J.A. 53. Moreover, Mr. Hayat's repeated evasive responses and failure to acknowledge that he had been present at the IHOP further supported Mr. Ayala Solano's report of criminal activity. *Id.* The record shows Officer Moran said both that Teslas have and *might* have rear-facing seats in the trunk. J.A. 300 at 00:02:40-47. Consequently, Sergeant Diaz did not know with certainty whether this particular Tesla in fact had rear-facing seats in the trunk and could not rule out conclusively that the children were placed in the trunk for purposes of seating or for purposes of kidnapping. Thus, there was sufficient indicia of reliability, and this Court should disregard Mr. Hayat's contentions otherwise.

### 3.     After Sergeant Diaz Arrived at the Residence, Mr. Hayat's Conduct Contributed to the Development of Reasonable, Articulable Suspicion.

Mr. Hayat argues that the District Court "overstepped its role at the summary judgment stage" by failing to consider his "counternarrative" regarding his conduct with Sergeant Diaz. *See* Appellant's Br. at 29-30. Mr. Hayat argues that because his expert witness concluded that "a polite denial that a crime had occurred, a cordial

25

decision not to answer questions, and an assertion of Constitutional rights are not suspicious[,]" that means that "there is a genuine dispute as to [whether] Sergeant Diaz reasonably considered Professor Hayat to be acting evasively or deceptively."[10] *See* Appellant's Br. at 38.

Mr. Hayat's arguments are without merit. The District Court correctly found that in addition to Sergeant Diaz's knowledge of the kidnapping report, the undisputed facts show that reasonable, articulable suspicion was further developed based on Mr. Hayat's conduct described by Sergeant Diaz and corroborated by the body-camera footage. J.A. 290.

Sergeant Diaz stated, and the body-camera footage showed that he arrived at Mr. Hayat's residence without lights on, parked the police cruiser, then walked up the driveway of the Residence where he encountered Mr. Hayat standing on the porch. J.A. 52 at ¶¶ 9-10. Sergeant Diaz found it suspicious that Mr. Hayat seemed to anticipate police arrival despite Sergeant Diaz not using his cruiser's lights, which suggested to him that Mr. Hayat may have knowledge regarding the reported

---

[10] Mr. Hayat concedes that "although facts may be undisputed, what is disputed is how the facts as stated could justify an officer developing reasonable, articulable suspicion." Appellant's Br. at 29-30. Mr. Hayat is correct that the facts are undisputed. As such it was appropriate for the District Court to view the facts in the light most favorable to Mr. Hayat and come to the legal conclusion that Sergeant Diaz had reasonable, articulable suspicion. That Mr. Hayat does not like the District Court's legal conclusion does not mean that he can manufacture a dispute of fact to preclude granting summary judgment. A dispute of analysis is not the same as a dispute of facts.

26

kidnapping. *Id*. at ¶¶ 11-13.

Mr. Hayat contends that there is a "disputed factual inference" that Sergeant Diaz found it suspicious that Mr. Hayat was waiting for him on the porch. *See* Appellant's Br. at 32. Mr. Hayat's brief states, without any citation to the record, that he saw Sergeant Diaz coming up the driveway and went on the porch to meet him, thus "it is illogical to consider Professor Hayat meeting Sergeant Diaz on his curtilage as 'suspicious activity[.]'" *See* Appellant's Br. at 33. However, Mr. Hayat fails to provide any support in the record to show that it was only after he saw Sergeant Diaz coming up the driveway that he went out onto the porch to meet him.

Sergeant Diaz also stated that he found it suspicious that when he explained he was investigating a reported kidnapping at the IHOP, Mr. Hayat was not surprised and did not deny that he had been at the IHOP. J.A. 54. Further, Mr. Hayat then avoided the question, answering only "there is no kidnapping here." *Id*. at ¶ 17. Sergeant Diaz described Mr. Hayat's behavior as defensive when Mr. Hayat tried to use his background as a law professor to deflect Sergeant Diaz's questions and even told Sergeant Diaz that he could not enter the Residence, despite Sergeant Diaz never requesting to do so. *Id*. at ¶ 18. Finally, Sergeant Diaz found it suspicious that Mr. Hayat seemed particularly concerned about Mrs. Hayat learning details of the kidnapping report by ushering Mrs. Hayat into the Residence exactly when Mrs. Hayat asked Sergeant Diaz to explain why he was there. J.A. 54. All of this combined

27

with Sergeant Diaz's knowledge, training and experience led Sergeant Diaz to believe that children were inside the Residence and were in danger. *Id*. at ¶ 20.

Mr. Hayat argues that what Sergeant Diaz described as evasiveness was really just Mr. Hayat engaging with an officer in "a non-extremely nervous manner" which is "exactly the sort [of reaction] police would want so as to avoid any dangerous escalation: calm and composed." *See* Appellant's Br. at 34. Mr. Hayat cites to *United States v. Slocumb*, 804 F.3d 677 (4th Cir. 2015), as support for his contention that his conduct and behavior should have dispelled rather than aroused Sergeant Diaz's suspicion.

In that case, this Court held that Mr. Slocumb's mumbled answers, not making eye contact with officers and hurrying his girlfriend along did not amount to reasonable suspicion under the totality of the circumstances. *Id*. at 680. This Court highlighted that Mr. Slocumb did not walk away or attempt to leave, noting that "where a defendant did not try to flee or leave the area, we have found reasonable suspicion on a showing of more 'extreme' or unusual nervousness or acts of evasion." *Id*. at 683. The Court cautioned that "it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset." *Id*. at 683 (quoting *U.S. v. Glover*, 662 F.3d 694, 699 (2011)).

Unlike *Slocumb*, Mr. Hayat did attempt to leave by retreating into the Residence. As such, this Court does not need to look for more extreme nervousness

28

or other acts of evasion, *see* 804 F.3d at 683, even though such acts of evasion are present here. J.A. 54 (Mr. Hayat's deflecting of questions and cutting off questioning of Mrs. Hayat).

More importantly, it was not Mr. Hayat's nervous behavior that Sergeant Diaz found suspicious. Rather, it was the fact that when confronted with a reported kidnapping, Mr. Hayat did not seem surprised. J.A. 54. Mr. Hayat even agrees that "[m]ost reasonable people would be understandably alarmed and upset to have police show up at their door and inquire whether they had kidnapped children." *See* Appellant's Br. at 34.  Yet, Mr. Hayat was not alarmed or upset to have Sergeant Diaz show up at his door to inquire about a kidnapping. J.A. 54. This absence of any surprise on Mr. Hayat's part is what Sergeant Diaz justifiably found suspicious. *Id*.

Mr. Hayat's lack of surprise at the reported kidnapping, combined with Sergeant's Diaz's other observations, was sufficient to support reasonable, articulable suspicion in the instant case.

**4.      There are no Disputes of Material Fact that Officer Moran Identified the Vehicle at Issue as a Tesla or That it Was Registered to Mr. Hayat.**

Mr. Hayat makes further arguments relating to alleged genuine disputes of material facts. Specifically, Mr. Hayat contends that Officer Moran never gave a description of the vehicle, and that Sergeant Diaz did not have enough information to conclude that Mr. Hayat drove a black Tesla because it was parked in the garage behind a closed door. *See* Appellant's Br. at 36-37.  These arguments fall flat upon

closer inspection.

First, the record is clear in the incident report and deposition testimony that Officer Moran "advised over the air that he was speaking to the original complainant" and Officer Moran understood the vehicle to be a Tesla after confirming Mr. Ayala Solano's observations of the suspect's vehicle. J.A. 42, J.A. 95 (Sergeant Diaz's deposition explaining how he heard the radio transmission of "Officer Moran's second statement about the Tesla and being with the original complainant"), J.A. 300 at 00:04:20-50 (Officer Moran describing possible seating configurations of a Tesla after speaking to Mr. Ayala Solano).

Second, Sergeant Diaz did have enough information to conclude that Mr. Hayat drove the Tesla despite not seeing it parked at the Residence that evening. The original complainant provided the vehicle's license plate number, and the Tesla's registration record provided that the registered owner lived at Mr. Hayat's address. J.A. 42, J.A. 300 at 00:01:19-32, J.A. 300 at 00:02:03-10. It is a commonsense inference that the registered owner of a vehicle is the driver of the vehicle. *See Kansas v. Glover*, 589 U.S. 376, 381 (2020).

## II.     **Exigency is Not a Requirement to Pursue a Valid *Terry* Stop After a Suspect Retreats Into a Residence.**

Mr. Hayat contends that there is "a clear exigent circumstance requirement" and officers may not enter a residence to continue a *Terry* stop absent exigent circumstances. *See* Appellant's Brief at 39, 42. He contends that the District Court

30

misconstrues *Terry* stop case law with exigency case law concerning hot pursuit of a fleeing suspect. *Id*. at 40. Mr. Hayat argues that the correct standard is that officers may enter a home to continue a *Terry* stop only if they are engaged in hot pursuit of a fleeing suspect, they have enough of a description of the suspect to reasonably limit the target of their search, and the officers have probable cause or first-hand knowledge of a crime prior to entering. *See* Appellant's Br. at 41-42. Mr. Hayat is wrong.

First, Mr. Hayat misstates both the issue before the District Court and the District Court's ruling. He incorrectly states that "the [D]istrict [C]ourt relied on the Supreme Court's decision in *United States v. Santana* and various Fourth Circuit decisions interpreting it to answer one question: does exigency law justify the warrantless entry of a suspect's home where officers attempt to make a *Terry* stop but the suspect runs and retreats into their home such that officers are in hot pursuit of a fleeing suspect." *See* Appellant's Br. at 40. The District Court did not cite to *United States v. Santana*, 427 U.S. 38 (1976). That case is not mentioned once in the District Court's memorandum opinion.

Moreover, the District Court explained that the issue "[r]elevant to the pending motion" before it was whether officers had reasonable suspicion of criminal activity to detain Mr. Hayat pursuant to a *Terry* stop and whether Mr. Hayat could avoid the *Terry* stop by retreating into the Residence. J.A. 283. The District Court

31

mentions "exigency" only once (in a section broadly explaining Fourth Amendment search and seizure law and without providing any accompanying analysis to the facts of the case), *see* J.A. 284, and never once mentions "hot pursuit" or "a fleeing suspect." *See* Appellant's Br. at 40. Mr. Hayat mischaracterizes both the issue before the District Court and the District Court's ruling.

Second, Mr. Hayat's interpretation of this Circuit's *Terry* stop case law and the necessary elements for officers to enter a residence to continue a *Terry* stop is deeply flawed. Mr. Hayat first relies on *United States v. Santana* where police officers drove to Ms. Santana's house having already established probable cause to think that she was dealing drugs. 427 U.S. at 40. Officers pulled up and observed Ms. Santana standing in her home's open doorway, then yelled "police," at which point Ms. Santana retreated into the house but was caught in the vestibule. *Id*. The Supreme Court upheld the warrantless entry as one involving hot pursuit. *Id*. at 42. The *Santana* Court makes no mention of *Terry* stops or reasonable, articulable suspicion to continue a *Terry* stop into a residence, which is the entire focus of the instant case. While the *Santana* decision may have been influential for future cases the District Court relied on, the case itself cannot provide guidance for this Court as it is factually and legally inapposite.[11]

---

[11] Mr. Hayat relies on two other cases which present different legal principles and different factual scenarios to the case at hand. *See* Appellant's Br. at 42 (citing *U.S. v. Curry*, 965 F.3d 313, 320 (4th Cir. 2020), as amended (July 15, 2020), as

The case law is clear that the necessary elements to detain an individual pursuant to a *Terry* stop where a suspect retreats into the home are: (1) encountering a suspect outside a home; and (2) officers having reasonable articulable suspicion of criminal activity prior to detainment. *See Allotey*, 2022 WL 17105120, at *6. Exigency was never argued by the officers in this case. Nor did the District Court make specific findings about exigency because it is not a required element of continuing a valid *Terry* stop under these facts.

## III.  Entry into the Residence was Justified to Check on the Welfare of the Children.

The District Court also found that the undisputed material facts show that the officers' warrantless entry into the Residence was lawful and justified to check on the welfare of the children. J.A. 288.

Mr. Hayat argues that the officers had no objectively reasonable basis on which to justify a warrantless entry based on the emergency aid exception because the officers were following "an unverified tip from an anonymous second party caller who provided no physical description of the person of interest, except that he was a 'Black male[,]'" and did not personally see any signs of physical violence or

---

amended (July 16, 2020), and *United States v. Dupree*, 2013 WL 4499037 at *6 (D. Md. Aug. 20, 2013)). *Curry* is inapplicable here as in that case, the government never claimed that Mr. Curry's stop was a valid *Terry* stop but claimed that the seizure was justified by the exigent circumstances exception.  And similarly, in *Dupree*, the officer's observations of the suspect were not sufficient to provide the required reasonable suspicion to enter a residence to effect a *Terry* stop.

33

imminent injury. *See* Appellant's Br. at 46; 48-49.

This argument mischaracterizes the information conveyed to Sergeant Diaz. By the time Sergeant Diaz encountered Mr. Hayat, he was not operating off of an unverified tip from an anonymous second party. Rather, Officer Moran spoke to the eyewitness to the incident, Mr. Ayala Solano, and updated Sergeant Diaz to confirm details of the first call to 911. *See supra* § I.C.2. Dispatch also told Sergeant Diaz that there was a suspected kidnapping. J.A. 300 at 00:00:18-28. This was not an unverified tip; it was the police investigating based upon an eyewitness account to ensure that children were not kidnapped and at risk of harm.

Additionally, Mr. Hayat relies on three cases for his argument that officers must have some "indication of a serious injury or immediate danger that required immediate action on the part of the officers" to justify a warrantless entry under the emergency aid exception. *See* Appellant's Br. at 49. However, the cited cases do not stand for that proposition.

First, in *Brigham City, Utah v. Stuart*, police officers entered a residence after looking through a window to see a juvenile punch an adult in the face, causing a bloody lip. 547 U.S. 398, 401 (2006). The Supreme Court held that the officers' entry was plainly reasonable under the circumstances as the "role of a peace officer includes preventing violence" and officers are not required to wait for a situation to become "worse before entering." *Id*. at 406. If officers in *Brigham City* were justified

34

in entering the residence without a warrant in connection with a minor offense (a juvenile causing only a bloody lip), *see id*. at 401, it logically follows that an officer investigating the kidnapping of children, a much more serious offense, would also be justified in entering a residence and not waiting for the situation to become worse. Sergeant Diaz only entered the Residence after Mr. Hayat confirmed there were children inside, and then abruptly cut off Sergeant Diaz's conversation with Mrs. Hayat and attempted to retreat into the Residence while Sergeant Diaz was still investigating the children's welfare. Sergeant Diaz's suspicions were heightened by Mr. Hayat's behavior, and he needed to rule out the possibility of kidnapping.

Second, Mr. Hayat relies on *Michigan v. Fisher*, 558 U.S. 45 (2009). In that case, officers responded to a report of a "disturbance" and upon arrival noticed upheaval and signs of a recent injury in the form of "drops of blood" outside. *Id*. at 48. The Supreme Court held that the officers' warrantless entry was justified because "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception[,]" since "[i]t does not meet the needs of law enforcement or the demands of public safety to require officers to walk away" simply because an apparent threat has not yet become actual harm. *Id*. Here, officers likewise did not need "ironclad proof" of a life-threatening injury to invoke the emergency aid exception to enter the Residence to assist potentially kidnapped children, especially given Mr. Hayat's suspicious behavior upon brief questioning

35

by Sergeant Diaz and his refusal to permit the police to see the children.

Finally, Mr. Hayat cites *United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013). In that case, officers responded to a domestic assault where Mr. Yengel was arrested and removed from the scene. *Id*. Officers then entered the residence and, without a warrant, pried open a safe inside a closet based on Mr. Yengel's wife admitting that years before she saw Mr. Yengel place a grenade inside. *Id.* at 395. This Court determined that at the time the officer entered the closet there was no emergency because Mr. Yengel had already been removed from the scene, and Mrs. Yengel did not provide information that the grenade was "live." *Id*. at 398-99. This Court explained that no exigency existed because the nature of the threat was stable and the location of the threat was immobile and inaccessible. *Id*. at 399. Differently here, the police were investigating an ongoing threat of potentially kidnapped children, thus, the emergency aid exception applied and the warrantless entry into the residence was justified.

## IV.    Alternatively, This Court Can Affirm Based on Appellees' Entitlement to Qualified Immunity.

Although the District Court did not make a finding on the issue of qualified immunity, appellate courts are "entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *United States v. Flores-Granados*, 783 F.3d 487, 491 (4th Cir. 2015) (quoting *Scott v. United States*, 328 F.3d 132, 137 (4th Cir.2003)). The defense of qualified immunity

was fully briefed before the District Court and this Court can affirm based on those grounds.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle* v. *Howards*, 566 U. S. 658, 664 (2012). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis in original).

The police officers in this case are entitled to qualified immunity because they did not violate clearly established law – an objectively reasonable officer would have believed the circumstances presented here justified a temporary investigatory detention. At the time Sergeant Diaz and later other officers entered the Residence pursuant to the *Terry* stop, it was not clearly established that it was a violation of Mr. Hayat's constitutional rights. Under the circumstances of a reported kidnapping of children, it was objectively reasonable for the officers to believe that reasonable articulable suspicion did exist, and that emergency assistance was authorized. There is no Supreme Court, Fourth Circuit or Maryland Supreme Court case identifying a constitutional violation under comparable circumstances when officers sought to enter a home without consent to complete a *Terry* stop investigation and check on

37

the safety of children who had reportedly been kidnapped. Therefore, it was not clearly established that the officers' entry into the home and seizure of Mr. Hayat would be a violation of his constitutional rights.

Indeed, in *Maros*, *supra*, 2024 WL 1528518 at *6, the court granted the officer qualified immunity, finding that "a reasonable officer in Cure's position would not have known that entering Plaintiff's home under the circumstances in this case violated Plaintiff's rights." Here, the officers are likewise entitled to qualified immunity, and this Court can affirm on those grounds.

## V.     This Court Cannot Consider Mr. Hayat's Unpreserved Arguments.

For the first time on appeal, Mr. Hayat argues that his porch is "curtilage" and part of his Residence, and as such "probable cause is the standard required for searches of the curtilage." *See* Appellant's Br. at 17, 21. Mr. Hayat newly claims that he "explicitly denied defendant officers permission to come onto his porch" and "revoked law enforcement's implied license to come on to the porch" when he refused to answer questions. *See* Appellant's Br. at 20.

"Generally, parties may not raise new arguments on appeal that were not first presented to the district court below." *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022). Because these arguments were not presented to the District Court, they are not preserved for this Court's review. *See In re Under Seal*, 749 F.3d 276, 289-91 (4th Cir. 2014).

38

This Court has stated that issues raised for the first time on appeal generally will not be considered, the rare exception being when the newly raised argument establishes fundamental error or a denial of fundamental justice. *See Stewart v. Hall,* 770 F.2d 1267, 1271 (4th Cir.1985). "This rigorous standard is an even higher bar than the 'plain error' standard applied in criminal cases . . . and the burden is on the party who has failed to preserve an argument to show that the standard is met." *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (citing *Under Seal*, 749 F.3d at 292).

Mr. Hayat has provided no explanation for why he did not raise this argument in the District Court. He has not attempted to contend with the required fundamental error standard nor shown how he can meet it here. As such, Mr. Hayat fails to satisfy his burden of establishing any fundamental error that could potentially warrant reversal on a ground not raised before the District Court. *See Under Seal*, 749 F.3d at 292 (holding that failure to argue fundamental error and its application on appeal "marks the end of the road for [an] argument for reversal not first presented to the district court" (internal quotation marks omitted)).

Further, even if Mr. Hayat attempted to show fundamental error, such efforts would fail here as an officer is not precluded from executing a *Terry* stop within the curtilage of a suspect's home. *See Maros*, 2024 WL 1528518, at *7 (recounting that this Court has upheld the warrantless entry in the curtilage of a home for the purpose of a seizure).

39

Ultimately, because Mr. Hayat did not make specific arguments regarding his curtilage-theory before the District Court, and Appellees had no opportunity to refute them, he cannot do so now on appeal.

## CONCLUSION

The District Court did not err in granting summary judgment to the County and dismissing the Amended Complaint and should thus be affirmed.

Respectfully submitted,

s/ *John P. Markovs*

John P. Markovs
County Attorney

s/*Edward B. Lattner*

Edward B. Lattner,
Deputy County Attorney

s/*Kristen J. Nunley*

Kristen J. Nunley
Assistant County Attorney

s/*Aaron Ramirez*

Aaron Ramirez
Assistant County Attorney

Attorneys for Appellees
Executive Office Building
101 Monroe Street, Third Floor
Rockville, Maryland 20850
(240) 777-6700
(240) 777-6705 fax

40

**REQUEST FOR ORAL ARGUMENT**

Appellees request oral argument before the Fourth Circuit in this case.

s/ *Kristen J. Nunley*

Kristen J. Nunley
Assistant County Attorney

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 9,911 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

s/ *Kristen J. Nunley*

Kristen J. Nunley
Assistant County Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September 2025, the foregoing Brief and Certificate of Compliance were served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the address listed below:

Aderson Francois (D.C. Bar No. 498544)
Civil Rights Clinic Georgetown University Law Center
600 New Jersey Ave, Suite 532
Washington, DC 20001
Phone: (202) 661-6721
Fax: (202) 662-9634
Aderson.Francois@georgetown.edu

s/ *Kristen J. Nunley*

Kristen J. Nunley
Assistant County Attorney

41