**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1235**

FAREED N. HAYAT, an individual,

Plaintiff - Appellant,

v.

SGT. CASEY DIAZ, BROOKE DOLAN, NATHAN LENHART, individually and in official capacity; MARCUS G. JONES, in official capacity; MONTGOMERY COUNTY, MARYLAND, a municipal entity; NICOLE MIN, individually and in official capacity,

Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Lydia Kay Griggsby, District Judge. (8:20-cv-02994-LKG)

Argued: May 8, 2026 Decided: August 20, 2026

Before WILKINSON, NIEMEYER, and BENJAMIN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined. Judge Benjamin wrote a dissenting opinion.

**ARGUED:** Kylie O'Donnell, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Aaron Ramirez, OFFICE OF THE COUNTY ATTORNEY, Rockville, Maryland, for Appellees. **ON BRIEF:** Aderson B. François, Laila Ahmed, Student Counsel, Thomas Stanley-Becker, Student Counsel, Yisroel Margolin, Student Counsel, Douglas Wickman, Student Counsel, Civil Rights Clinic, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. John

P. Markovs, County Attorney, Edward B. Lattner, Deputy County Attorney, Kristen J. Nunley, Assistant County Attorney, OFFICE OF THE COUNTY ATTORNEY, Rockville, Maryland, for Appellees.

NIEMEYER, Circuit Judge:

After the Emergency Communications Center in Montgomery County, Maryland, issued a priority call to Montgomery County police officers to "respond priority for a kidnapping" after a witness saw someone put three children into the trunk of a vehicle, the officers traced the driver to Fareed Hayat, who lived nearby in Silver Spring. When officers approached Hayat, who was standing on the porch of his house with his wife, he acted suspiciously, stating that there was "no kidnapping here," cutting off a conversation between his wife and the officers, and attempting to retreat into his home, telling them, "You cannot come into our house." After the officers initiated a *Terry* stop[*] and prevented Hayat from shutting the door, they entered into the front hall of the house to handcuff Hayat and complete their investigation. They determined that Hayat had not kidnapped the children and released him.

Hayat commenced this action against the police officers, the Chief of Police, and Montgomery County under 42 U.S.C. § 1983, alleging that the defendants violated his Fourth Amendment right to be free from unreasonable seizures, his Fourteenth Amendment right to familial privacy, his federal property rights under § 1982, and his rights under state constitutional and tort law. The district court granted the defendants' motions to dismiss and for summary judgment, ruling that the officers had a reasonable articulable suspicion of child kidnapping to justify their initiation of a *Terry* stop before Hayat retreated into his house; that the officers were justified in entering the house to complete the *Terry* stop; and

[*] *Terry v. Ohio*, 392 U.S. 1 (1968).

that an additional exigency existed to confirm the welfare of the children in circumstances where Hayat was "imped[ing] their ability to check" on the children.

For the reasons given herein, we affirm.

## I

In the evening of October 22, 2017, the Montgomery County Emergency Communications Center advised Montgomery County police officers over the radio of a "respond priority for a kidnapping" near Piney Branch Road and University Boulevard. A "priority call" is the "highest level of urgency and police response," and "kidnapping in progress calls are rare." The Communications Center explained that the "complainant was told by another driver that [the other driver] saw someone grab three children and put them in the trunk of a vehicle." The complainant provided a description of the suspect as a Black man and the vehicle as black with Maryland license plate number 6CC8056, which was headed northbound on University Boulevard toward Wheaton. Police Sergeant Robert Sheehan responded over the radio that "the car comes back to a 2013 Tesla, to a Black male, 1 Eastmoor Drive in Silver Spring," and Officer Jorge Moran added that "Teslas have rear-facing seats in the trunk, so they might be able to sit there."

The information reported by the Communications Center was based on a 911 call from a person who identified himself as "Luis" and who said that he was relaying information that he had received from an eyewitness, who was shortly thereafter identified as Edgar Ayala Solano.

Soon after the emergency dispatch, Officer Moran advised on the air that he had made in-person contact with Solano, reporting:

> I have the original complainant here. He says that he was at the IHOP in Langley Park, that he saw the Black male open the trunk, yell at the kids, and then close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal.

As Officer Moran later described this conversation in more detail, Solano, speaking in Spanish, stated "that he witnessed a gentleman come out, open up a trunk, tie up children inside, yell at them, and slammed and shut [the trunk] before driving off." Solano also told Moran that he believed the children were in danger, which is why he wrote down the tag of the vehicle and followed it to an intersection, where he attempted to locate a police officer and where he instructed another citizen, Luis, to call the police.

Sergeant Casey Diaz and Officer Nicole Min responded to the child-kidnapping dispatch and drove to 1 Eastmoor Drive, Silver Spring, in a marked police cruiser. Before approaching the residence, Diaz shut off his police cruiser lights and siren to avoid alerting the subject of their presence. Diaz then led the way, walking up a driveway to the residence where he observed a Black male and female, later identified as Hayat and his wife, Norrinda Hayat, standing on the steps.

As Sergeant Diaz and Officer Min — both dressed in uniform — approached the Hayats, the officers observed that the couple "did not appear surprised by [the officers'] arrival, and instead, appeared to have anticipated" it. Diaz "found it suspicious" in that the individuals had not requested police assistance yet were "apparently anticipating police arrival." The following conversation then ensued, as recorded by Diaz's body camera:

Sgt. Diaz: Hi, how are you doing? Everything okay here?

Hayat: [indiscernible]

Sgt. Diaz: Were you guys just at the IHOP down in Langley Park?

Hayat: What's the problem?

Sgt. Diaz: We got a call of a kidnapping, or something like that, were you guys down at the IHOP?

Hayat: There is no kidnapping here, sir.

Sgt. Diaz: What?

Hayat: There is no kidnapping here, sir.

Sgt. Diaz: Okay, well I just need to make sure everybody is ok.

Hayat: Okay . . . how are you going to do that?

Sgt. Diaz: Well, we are talking. We are talking.

Hayat: Everything is ok here.

Sgt. Diaz: Well, I need to check. Are there any kids here?

Hayat: Yes.

Sgt. Diaz: Well, can we see them?

Hayat: You cannot come into our house. We are both lawyers. I am a professor at the University of Howard, she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home.

[Overheard in the background] Mrs. Hayat: I am a professor of law.

Sgt. Diaz: Can you come down here for a second?

Hayat: I cannot.

Mrs. Hayat: Can you explain to us what is going on here?

Sgt. Diaz: Yeah, somebody saw something involving some kids at an IHOP . . .

At that point, Hayat abruptly cut off their conversation, put his arm around his wife and ushered her back into the home, and attempted to shut the door, while saying to her, "Norrinda, walk into our home please. Walk into our home."

Sergeant Diaz, who had years of experience as an officer and in conducting interviews, found the circumstances of this encounter especially suspicious. First, after he told Hayat that there had been a report of a kidnapping and asked him whether he had been at the IHOP, Hayat did not answer the question. Rather, he responded immediately, "There is no kidnapping here." Diaz found this response to be "evasive and showed signs of deception because [Hayat] never acknowledged whether or not he had been at the IHOP," and he "did not act surprised or deny that he had been at the IHOP" once he learned the investigation was about a kidnapping. Hayat also "avoided" answering the question by using "his background as a law professor as a deflection." Diaz further found suspicious the fact that Hayat stopped his wife from speaking about the incident and ushered her back into the house. Diaz concluded that Hayat was preventing Mrs. Hayat "from sharing information she may have had about the children's welfare" and that Hayat "seemed particularly concerned about her learning details of the kidnapping report that [Diaz] was trying to share with her." Indeed, as Diaz observed, Hayat "became even more agitated when [Mrs. Hayat] asked [Diaz] to explain what was going on." Finally, Diaz found it suspicious that when he "asked to see the children to verify their welfare, [Hayat] became even more defensive," relaying his attorney background.

Sergeant Diaz concluded that he had to "complete [his] investigation and determine whether a kidnapping ha[d] occurred" and ascertain "the welfare of the children." He also concluded it was important for him to pursue his suspicion that Mrs. Hayat might "have some information as to what happened at the IHOP, . . . [and] the welfare of the children involved."

When Hayat cut off Mrs. Hayat's attempt to enter the conversation and ushered her back into the house, Hayat attempted to close the door. Sergeant Diaz, however, prevented the door from being closed and issued several commands to Hayat to open the door. Officer Min assisted Diaz in attempting to open the door, as Hayat physically resisted by pushing back against the door and yelling, "You are not allowed in our house." While Diaz and Min were pushing open the door, Officers Nathan Lenhart and Brooke Dolan arrived at the scene and assisted in pushing the door open and gaining entry into the vestibule of Hayat's house. Hayat yelled at the officers, repeatedly stating that he was a law professor and that they could not be in his home.

After the officers entered the home and Hayat continued to physically resist them, they placed him in handcuffs. Hayat sustained a bloody lip, but there are no allegations that officers otherwise physically assaulted him. After Hayat had calmed down, officers removed the handcuffs and allowed him to remain seated in the house and to use his cell phone. Mrs. Hayat eventually allowed Officer Dolan to observe the children to confirm that they were okay. Sergeant Diaz spoke with Hayat's brother, who had also arrived at the house, and the brother advised Diaz that the children inside the home were either the Hayats' children or his (the brother's) children and that they therefore belonged at the

residence. The officers did not conduct a search of the house but rather concluded, after additional conversations, that a kidnapping had not occurred and departed from the house.

Hayat commenced this action against the four police officers who had entered his home, the Chief of Police, and Montgomery County, alleging federal and state constitutional claims, a federal statutory claim, and state tort claims. After the district court dismissed most of the claims, it granted the defendants summary judgment on those that remained. With regard to Hayat's Fourth Amendment claim — the only claim on appeal — the district court concluded that the officers had lawfully entered the Hayats' house pursuant to a *Terry* stop that the officers had begun outside the house. The court explained that the officers had a reasonable articulable suspicion involving the kidnapping of children before they entered into the house and that "a suspect's retreat into their home [could not] thwart a *Terry* stop." The court also noted that the law enforcement officers were justified in entering a home on the exigency of preventing serious injury and "to check on the welfare of the children."

From the district court's judgment dated February 12, 2025, Hayat filed this appeal, challenging only the district court's denial of his Fourth Amendment claim.

## II

Hayat contends that the Montgomery County police officers violated his Fourth Amendment rights when investigating the kidnapping report. He argues that the officers did not have a reasonable articulable suspicion to conduct a *Terry* stop; that, in any event, no *Terry* stop was conducted outside his home because he was first seized inside his home;

that even if the *Terry* stop had been conducted outside his home, officers could not have entered his home and continued the *Terry* stop inside the home without a warrant; and that exigent circumstances did not justify the officers' entry into his home.

The applicable foundational principles are not disputed. The Fourth Amendment provides, as relevant here, "The right of the people to be secure in their . . . houses . . . against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. And consistent with that language, the Supreme Court has held that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). Thus, at its core, the Fourth Amendment guarantees a person the right "to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." *Case v. Montana*, 607 U.S. 107, 113 (2026) (quoting *Caniglia v. Strom*, 593 U.S. 194, 198 (2021)). Such an intrusion without a warrant is "presumptively unreasonable." *Payton*, 445 U.S. at 586.

But the requirement of a warrant is subject to exceptions for exigencies, among them when an officer has "an objectively reasonable basis for believing" that someone inside needs emergency assistance, is "seriously injured," or is "imminently threatened with such injury," *Brigham City v. Stuart*, 547 U.S. 398, 400 (2006); *see also Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam), or when a defendant retreats into his home to "thwart an otherwise proper arrest" that had been set in motion, *United States v. Santana*, 427 U.S. 38, 42 (1976); *see also Warden v. Hayden*, 387 U.S. 294, 298–99 (1967).

It is also now well established that, outside the home, police officers do not violate the Fourth Amendment's guarantee against unreasonable seizures if they conduct a brief, investigative stop of a person when they have a reasonable articulable suspicion "that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Such a stop is, to be sure, a "seizure" of the person because the officers, "by means of physical force or show of authority, ha[ve] in some way restrained the liberty" of the person, *id*. at 19 n.16, but it is justified by the public interest in law enforcement.

With these fundamental principles, we must determine, in response to Hayat's arguments, (1) whether the police officers had a reasonable articulable suspicion that a kidnapping may have taken place; (2) whether officers initiated a *Terry* stop outside of Hayat's home; and (3) whether, in the circumstances where the first two are true, the officers were justified in entering Hayat's home without a warrant to complete the *Terry* stop. Hayat also argues (4) that no exigent circumstances were present. We take Hayat's arguments in order.

## A

Hayat contends first that Sergeant Diaz did not have a "reasonable articulable suspicion" that criminal activity may have been afoot when he confronted Hayat and therefore that any purported *Terry* stop was unjustified.

"Reasonable suspicion" requires a showing that an objectively reasonable officer would have had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (cleaned

up). The police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. The inquiry must consider "the totality of the circumstances." *Navarette*, 572 U.S. at 397 (cleaned up). While the officer "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *Terry*, 392 U.S. at 27), what he must show is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In short, the officer "bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

We conclude that the facts known to Sergeant Diaz were more than sufficient to create a reasonable suspicion that criminal activity involving Hayat may have been afoot and that therefore a *Terry* stop of him was justified.

*First*, Montgomery County police officers, including Sergeant Diaz, received a dispatch of a child kidnapping, which was an unusual and serious crime, and the dispatch was prompted by a 911 call received from a person named "Luis," who was relaying an eyewitness's account of the purportedly criminal conduct. Luis reported that Solano, the eyewitness, "saw someone grab three children and put them in the trunk of a vehicle" and that the "someone" was a Black male, driving a black Tesla with a Maryland license plate number 6CC8056.

*Second*, the license plate number was linked to a 2013 Tesla vehicle, owned by Fareed Hayat, a Black male, living nearby at 1 Eastmoor Drive in Silver Spring. Officer Moran shared over the radio that some Teslas have rear-facing seats in the trunk.

*Third*, in response to the dispatch, Officer Moran was able to find and interview Solano and thus reported over the radio:

> I have the original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and then close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal.

Solano also advised Officer Moran that, based on his observations, he had believed that the children were in danger, prompting him to write down the tag of the vehicle and follow it to an intersection, where he attempted to locate an officer. He stated that he then instructed Luis to call the police.

*Fourth*, upon visiting the address provided over the radio, Sergeant Diaz and Officer Min were surprised to see, as they approached the house, that a Black male and female (Hayat and Mrs. Hayat) were standing on the porch and seemed unsurprised by their arrival, indeed acting as if they were "anticipating" it.

*Fifth*, when the officers questioned Hayat about the child kidnapping, Hayat was unresponsive, refusing to confirm whether he had been at the IHOP, refusing to let officers see the children in the house, and refusing to let his wife speak to the police, ending the encounter abruptly with an attempt to retreat into his house.

*Sixth*, Sergeant Diaz concluded, based on his personal experience — having worked for 12 years as a police officer with specialized training in conducting interviews and

interrogations, including "recognizing the signs of deception," and having conducted more than 200 interviews during those years — that his interchange with Hayat had not dispelled his initial suspicion but instead heightened it. Sergeant Diaz explained his reasons in detail, as follows:

(1) Hayat "matched the limited description of the subject provided by the caller" in that he was a Black male at the address to which the Tesla was registered;

(2) The Hayats "did not appear surprised" by his arrival and "appeared to have anticipated" it despite not having called for police and Sergeant Diaz having switched off his lights and siren;

(3) Hayat "did not act surprised" by the report of a kidnapping and "avoided" answering whether he had been at the IHOP;

(4) Hayat used his status as a law professor to "deflect[]" Sergeant Diaz's questions;

(5) Hayat confirmed that there were children in the house but denied Sergeant Diaz's request to see them;

(6) Hayat proactively told Sergeant Diaz that he could not enter the home, despite Diaz not having requested permission to do so; and

(7) When Mrs. Hayat asked Sergeant Diaz to explain the situation and Diaz began conversing with her, Hayat "seemed particularly concerned" about Mrs. Hayat's "learning details of the kidnapping report that [Diaz] was trying to share with her," and Hayat prevented her from sharing information "she may have had about the children's welfare" by "abruptly" and "suddenly" ending the

conversation, and beginning to close the door with himself, Mrs. Hayat, and the children inside.

Hayat argues nonetheless that the tip on which the dispatch of child kidnapping depended was unreliable and uncorroborated, undermining the reasonableness of Sergeant Diaz's suspicion. It is true that a tip "must contain sufficient 'indicia of reliability' to enable officers to evaluate the veracity of the tip before stopping whomever the tip identifies." *United States v. Brown*, 401 F.3d 588, 596 (4th Cir. 2005) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)); *Navarette*, 572 U.S. at 397. But the tip in this case bore nearly every indicum of reliability identified by the Supreme Court in *Navarette* as sufficient.

In *Navarette*, the Court highlighted the following factors as indicating reliability: (1) "officers' corroboration of certain details;" (2) a tip that alleges an eyewitness account of the alleged crime; (3) a contemporaneous tip, which is "especially reliable;" and (4) "the caller's use of the 911 emergency system," because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id*. at 398–400. The Court then applied those factors to its case, explaining that "[b]y reporting that she had been run off the road by a specific vehicle — a silver Ford F-150 pickup, license plate 8D94925, . . . the tipster necessarily claimed eyewitness knowledge of the alleged dangerous driving," which lent "significant support to the tip's reliability." *Id.* at 399. In addition, circumstances indicated that she had "reported the incident soon after she was run off the road," thus constituting contemporaneous reporting. *Id*.

The tip here had all the same indicia of reliability as in *Navarette*. The tipster, Luis, made a 911 call reporting that Solano had told him to call the police after Solano had witnessed a man grabbing three children and putting them in the trunk of a vehicle. Luis passed on a description of the driver, the vehicle, the license plate number, and the travel direction. Additionally, Officer Moran was then able to locate and interview Solano shortly after the incident, and Solano described the events consistent with Luis's initial report. Finally, the license plate number was immediately traced to a man and a vehicle fitting the descriptions given by the tipsters. Thus, in effect, a police officer corroborated Luis's tip through an almost contemporaneous person-to-person interview with the actual eyewitness. We conclude therefore that the tips here were reliable and amply met the standard set forth in *Navarette*. *Accord United States v. Mitchell*, 963 F.3d 385, 394 (4th Cir. 2020).

Hayat also challenges Sergeant Diaz's characterizations of his interaction with Hayat, claiming that he, Hayat, was calm, polite, and not suspicious. But Sergeant Diaz saw things differently based on his years of training and experience. Moreover, after reading the transcript of the conversation, which Hayat does not dispute, and reviewing the body camera videos, we agree with Diaz's characterization of what actually took place. Indeed, Hayat has challenged neither the video nor the transcription. And it is these objective data that inform us of what a reasonable officer would have concluded. *See Wardlow*, 528 U.S. at 124–25.

Finally, Hayat argues that the fact that he told Sergeant Diaz there had been "no kidnapping here" should have "dispel[led] the reasonable suspicion" of a kidnapping.

*Navarette*, 572 U.S. at 403. But it would be "hardly surprising that the appearance of" a police officer questioning a suspect about a kidnapping would "inspire" that suspect to deny involvement in the crime. *Id*. Moreover, the whole purpose of a temporary stop under *Terry* is to permit a police officer to "detain [a suspect] to resolve [any] ambiguity" in the suspect's conduct. *Wardlow*, 528 U.S. at 125 (citing *Terry*, 392 U.S. at 30).

In short, Solano reported having witnessed events that suggested that a child kidnapping had taken place, multiple pieces of corroborated information linked Hayat to the incident, and Sergeant Diaz was unable to dispel the suspicion in his conversation with Hayat. Rather, the conversation heightened Diaz's suspicion. In the totality of these circumstances, we conclude that Diaz had reasonable articulable suspicion that criminal activity may have been afoot to justify a *Terry* stop of Hayat.

Had Sergeant Diaz walked away after Hayat retreated into his house, Diaz would not have known whether he was releasing a vile criminal or an innocent person. Moreover, had he walked away and had Hayat indeed been engaged in child kidnapping, the public, as well as the victims, would justifiably have been outraged by the police conduct. Common sense would have dictated that Diaz had a reasonable suspicion that criminal activity was afoot and yet he did not do his duty to dispel that suspicion. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 222 (4th Cir. 2008) (noting that courts must "approach the Fourth Amendment . . . with at least some measure of pragmatism"). "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," he may temporarily seize the person to

dispel his suspicion, *Terry*, 392 U.S. at 30, and the public rightfully expects that law enforcement officers will do so.

At bottom, we reject Hayat's argument that Sergeant Diaz and the other officers investigating the kidnapping report did not have the proper level of suspicion to conduct a *Terry* stop.

B

Hayat next contends that a *Terry* stop was not conducted outside his house and that officers could not have legally entered his house to conduct such a stop. He explains that "for a *Terry* stop to occur, there must be, at a minimum, a show of authority such that a reasonable person would not feel free to go" and that "Sergeant Diaz did not show any such authority before Professor Hayat reentered his home." Accordingly, he argues that there was no seizure by Diaz before Hayat retreated into his home.

To be sure, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). And for purposes of the Fourth Amendment, the Hayats were in a public place as the officers approached them. *See, e.g.*, *United States v. Santana*, 427 U.S. 38, 42 (1976). But if "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business," then the police would have seized him. *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (cleaned up). In sum, "a person is seized by the police and thus entitled to

challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up).

In this case, Sergeant Diaz's encounter with Hayat did indeed begin as a voluntary encounter in a public place. It began simply with Diaz's asking of questions. But when Hayat stopped answering questions, told his wife to go inside the home, and then began retreating into his home, Diaz vocally told the Hayats to stop and physically prevented them from closing the door, as shown on Diaz's body camera. As Diaz explained

> I believed that children were inside of the residence and were in immediate threat of serious danger, including serious injury or threat of serious injury. Therefore, when [Hayat] suddenly attempted to end my investigation and closed me outside the home with the children inside, I attempted to prevent [Hayat] from closing the door.

And indeed, Hayat was unable to close the door against the officers, as the officers entered Hayat's home and secured Hayat with handcuffs in the vestibule.

Thus, when Sergeant Diaz, as a uniformed police officer, gave verbal commands and took physical action indicating that the Hayats were not free to disengage, Diaz made a "show of authority" "sufficient to make it apparent that [Hayat was] not free to ignore the officer and proceed on his way," as required to support a seizure. *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (citation omitted); *see also Terry*, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"). Thus, before the officers entered Hayat's home, they initiated — albeit did not complete — a *Terry* stop.

Hayat repeatedly makes the argument that because he was a law professor, he knew his Fourth Amendment rights and that, with that knowledge, *he felt* free to leave the encounter. But this argument fails to recognize that the "seizure" inquiry is not based on what *the suspect felt*, but on what a *reasonable person would have felt* in the circumstances — an objective standard. *See Bostick*, 501 U.S. at 437.

C

Hayat also contends that even if a *Terry* stop had been initiated outside his home, it could not have been continued into his home without probable cause and a warrant. Of course, a *Terry* stop may be conducted when the officer is able to point to *reasonable articulable suspicion* that criminal activity may be afoot, and entry into the home may be justified generally by a warrant issued pursuant to *probable cause*. Thus, the *Terry* stop cannot be a substitute for the probable cause and warrant necessary for entry into a home.

But the issue here is not whether reasonable suspicion can suffice to authorize officers to enter a home. Rather, it is whether a *Terry* stop properly initiated *outside* the home must end by the suspect's flight into the home. We conclude that the Constitution does not provide such exceptional and mechanical protection of the home in the exigent circumstances where a suspect flees into his home from an ongoing *Terry* stop and where children's welfare may be threatened.

To be sure, in prohibiting unreasonable searches and seizures of a person's house, the Fourth Amendment protects the privacy and sanctity of the home, and such a search or seizure in the home without a warrant is presumptively unreasonable. *Payton*, 445 U.S. at

585–86. But in exigent circumstances arising from the need to act quickly, such as in the context of a fleeing suspect, the immediate destruction of evidence, or the protection of persons at risk of injury, the Court has found entry into the home without a warrant to be reasonable. *See Brigham City*, 547 U.S. at 403.

Thus, in circumstances similar to those before us — where the police were informed that an armed robbery of a cab company had taken place and that a cab driver had followed the suspect to a home five minutes away, providing the police with a description — the Supreme Court held that the police "acted reasonably when they entered the house and began to search for a man of the description they had been given." *Warden v. Hayden*, 387 U.S. 294, 298 (1967). The Court explained:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have ensured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Id*. at 298–99. The Court thus recognized that the Fourth Amendment does not prohibit police, with reliable information, from acting quickly to enter a home without a warrant when the exigency of quick action so requires.

Applying *Warden* to similar circumstances in *United States v. Santana*, the Supreme Court stated that the "need to act quickly [in the circumstances presented in *Santana*] [was] even greater than in [*Warden*] while the intrusion [was] much less." 427 U.S. at 42. The Court nonetheless found *Warden* to be supportive. In *Santana*, after an undercover officer paid Patricia McCafferty for heroin, McCafferty went into the house of "Mom Santana,"

gave her the money, and brought out the heroin to give to the undercover agent, which she did while the two were in a car. *Id.* at 40. After the undercover agent received the heroin, he arrested McCafferty, who then told him that Mom Santana had the money. Accordingly, officers returned to Mom Santana's house and saw her standing in the doorway. *Id.* They shouted "police," showed their badges, entered the house without a warrant, and recovered the money from Mom Santana. *Id.* The Supreme Court held that the entry into the house did not violate the Fourth Amendment under a "hot pursuit" exception. *Id.* at 42–43. Defining "hot pursuit" freely, however, the Court recognized that the hot pursuit in *Santana* "ended almost as soon as it began," as the suspect retreated only a few steps into her home. *Id*. at 43. But the Court recognized that the officers needed to act quickly, *id*. at 42–43, concluding "that a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id*. at 43. While the Court characterized the exception as the "hot pursuit" exception, it noted that in substance it was similar to the circumstances in *Warden*, explaining more precisely that the decision in *Warden* "was based upon the *exigencies of the situation* and did not use the term hot pursuit or even involve a hot pursuit in the sense that that term would normally be understood." *Id*. at 42 n.3 (cleaned up) (emphasis added).

In any event, both *Warden* and *Santana* stand for the commonsense proposition that a person who has become a suspect for criminal activity may not rely on the constitutional protections of his house to thwart the officers' attempt to make an arrest.

Consistent with *Warden* and *Santana*, we have held that a *Terry* stop initiated outside the home similarly could be completed inside the home without a warrant when the suspect retreated into the home. As we explained:

> In this case, the appellants do not dispute, nor could they, that Officer Washington was entitled to conduct a *Terry* stop of Juan once he arrived at the scene of the Juan/Jessica domestic dispute. Officer Washington approached Jessica first [and ordered Juan to stand by], but before he had a chance to question Juan, Juan entered the Rivera apartment. Under these circumstances, Officer Washington, as well as Officer Trumble, was entitled to enter the Rivera apartment to conduct the *Terry* stop inside the Rivera apartment.

*Rivera v. Washington*, 57 F. App'x 558, 562 (4th Cir. 2003) (per curiam). While *Rivera* was an unpublished opinion, which we do not recognize as binding precedent, we nonetheless adopt its holding here and conclude that when an officer has reasonable suspicion that criminal activity is afoot and that the activity involves risk of injury, he may, to allay his suspicion and the concern for injury, extend his *Terry* stop of the suspect into the suspect's home following the suspect's retreat.

The principles underlying *Warden*, *Santana*, and *Rivera* apply here. Similar to the facts in *Warden*, the police here received reliable information that Hayat was a suspect of child kidnapping; based on the information they received, they initiated a *Terry* stop outside Hayat's house; and when Hayat attempted to retreat to his house, they continued the *Terry* stop inside the house. Because of the need to act quickly, to retain control over the suspect, and to be able to protect the children alleged to have been kidnapped, the officers extended the temporary stop into Hayat's home to where he had fled. This is just

the type of exigency of which the *Warden* Court spoke. Indeed, the exigency exception to the Fourth Amendment is yet broader. As the Supreme Court stated in *Brigham City*:

> Because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions [that are characterized as exigencies, such as] to fight a fire and investigate its cause, to prevent the imminent destruction of evidence, . . . to engage in "hot pursuit" of a fleeing suspect, . . . to render emergency assistance to an injured occupant or to protect an occupant from imminent injury [and] . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur.

547 U.S. at 403–04 (citations omitted). In this case, at least two types of exigency were implicated — the retreat into the home to avoid the continuation of a *Terry* stop and the concern for the welfare of allegedly kidnapped children. Accordingly, we reject Hayat's argument that the officers should have abandoned their *Terry* stop and obtained a warrant before entering his home.

D

Finally, Hayat argues that the Montgomery County police officers did not have a basis to conclude that exigent circumstances existed to justify their entry into his home without a warrant. As he states the argument, the police officers "had no objectively reasonable basis on which to justify an entry based on the emergency aid exception." He grounds his argument mainly on the fact that the tip given to the police was not adequately corroborated and therefore was unreliable.

First, we reject his claim that the tip was unreliable. As we explain above, the officers had objectively reasonable suspicion that criminal activity involving Hayat may have been afoot and that the tips they received were reliable.

In addition, however, Hayat also parses various pieces of information received by the officers to address their sufficiency, but in doing so he overlooks the totality of the circumstances. The initial tipster in this case received information from an eyewitness, and the police were able to corroborate both reports by interviewing the eyewitness almost contemporaneously about what he had seen transpire. Solano described the vehicle and the driver, and he specifically provided the vehicle's license plate number. He also described the incident as he saw it. The officers did not find him disingenuous or manipulative, and they concluded that they could not dismiss the report without further investigation. Clearly, "reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette*, 572 U.S. at 403 (cleaned up). Moreover, child kidnapping is not a crime about which to guess wrong, and when circumstances indicate that such a crime might be taking place, officers could legitimately be concerned about the safety and welfare of the children involved. *Cf. Pleasants v. Town of Louisa*, 524 F. App'x 891, 896 n.3 (4th Cir. 2013) (where child welfare is concerned, "that a police officer errs on the side of believing a statement and subsequently checking on the child is often the preferable choice").

The officers initially began their investigation by identifying the driver, the vehicle, and the address connected to them. After finding the address linked to the vehicle, they confronted Hayat with straightforward questions designed to dispel their concerns. But Hayat immediately thwarted their efforts, refusing to answer easy questions and then attempting to retreat into his house, which the officers forcefully attempted to prevent. In these circumstances, the officers' suspicion was legitimately heightened. They did not

know whether Hayat was trying to escape or do something to the children. And if the officers had abandoned their efforts, as Hayat would have had them do to get a warrant, an actual perpetrator could well have escaped with the children.

Thus, the reasonable suspicion and the nature of the crime created circumstances that justified the officers' completion of their *Terry* stop in Hayat's house and checking on the children. "Under the circumstances of this case, the exigencies of the situation made [the] course imperative." *Warden*, 387 U.S. at 298 (cleaned up).

* * *

Why Hayat refused to cooperate with police officers when first being questioned to dispel their concerns is not apparent but curious, and the resulting engagement in Hayat's home was unfortunate in light of the investigation's ultimate conclusion that Hayat was not in fact engaged in child kidnapping. In the circumstances, however, we conclude that Hayat's Fourth Amendment rights were not violated.

AFFIRMED

DEANDREA GIST BENJAMIN, Circuit Judge, dissenting:

The majority mischaracterizes a consensual encounter between Fareed Hayat and Officer Casey Diaz on the porch of Hayat's home. In doing so, it abridges Hayat's right to terminate such an encounter, refuse police questioning, and retreat into his home by converting that encounter into an investigative detention. The majority takes it a step further by creating a rule that an incomplete *Terry* stop is enough to permit police officers to enter an individual's home—one that stands in blatant conflict with minimum protections of the Fourth Amendment. Justice Scalia warned us that the warrant requirement was "riddled with exceptions [such] that it was basically unrecognizable" and the majority's decision today manufactures another exception complicating the warrant requirement further. *California v. Acevedo*, 500 U.S. 565, 582 (1991) (Scalia, J., concurring in the judgment). Because privacy protections are most heightened in the home, an area profoundly safeguarded by the Fourth Amendment, I respectfully dissent.

## I. Background

An anonymous caller, referred to as Luis, called in to the Montgomery County Emergency Communications Center ("ECC") to report that he "was told by another driver that he saw someone grab three children and put them in the trunk of a vehicle" outside an IHOP in Silver Spring, Maryland. ECC Audio, at 00:00:29-00:00:36.[1] But because Luis

[1] Volume II of the joint appendix contains an audio file of the emergency dispatch call to MCPD officers. It is cited as ECC Audio, at 00:00:00-00:00:00.

was only "told about [the] kidnapping" secondhand, J.A. 46[2], he told the ECC dispatcher that he did not see anything.[3]

The ECC dispatcher alerted Montogomery County Police Department ("MCPD") officers to "respond priority for a kidnapping." ECC Audio, at 00:00:18-00:00:28. ECC noted the report was for "[a] suspect vehicle, black, [license plate number], driven by a black male, northbound university towards Wheaton, unknown location in route." ECC Audio, at 00:01:19-00:01:32.

MCPD Officer Robert Sheehan ultimately traced the license plate "to a 2013 Tesla, [registered] to a black male [at] 1 Eastmoor Drive in Silver Spring." ECC Audio, at 00:02:03-00:02:10. MCPD Officer Jorge Moran sought to make in-person contact with Edgar Ayala Solano, who originally told Luis what he witnessed. On his way to the IHOP, Moran advised all officers on the dispatch line that "Tesla's have rear-facing seats in the trunk, so they might be able to sit there." ECC Audio, at 00:02:40-00:02:47. Solano detailed to Moran that he was parked at the IHOP when "he observed the rear hatch of a black door sedan open" and that "2 children [were] strapped in[] the car." J.A. 42. Moran informed the dispatch line that Solano "was at the IHOP in Langley Park, that he saw the

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the lower court. Page numbers for citations to the J.A. utilize the "J.A." numbering at the bottom of the page on each document.

[3] Later in his call to ECC, Luis advised that he was following the suspect vehicle on University Boulevard E, and that the vehicle was a "a white range rover with tinted windows" driven by "a black male." J.A. 42. When MCPD Officer Craig Rosia located Luis and the white Range Rover, Luis immediately drove off because he "did not wish to be seen." *Id.* Luis provided no information after this point but Rosia concluded there were no children in the white Range Rover.

black male open the trunk, yell at the kids, and then close the trunk, but like [he] said, they might have possible rear-facing seats in the trunk that are legal." ECC Audio, at 00:04:28-00:04:50.[4]

Officers responded to 1 Eastmoor Drive, the registered address for the suspect vehicle. Diaz arrived first. Diaz turned his patrol lights and sirens off shortly before he parked outside of the home on the street. As Diaz approached the home, only a white BMW SUV was parked in the driveway. Bodycam Footage, at 00:38.[5] There was no black Tesla in sight. As Diaz walked up the driveway, he was met by Hayat and his wife, Norrinda, standing on their front porch. The following exchange ensued:

Diaz: Hi, how are you doing? Everything okay here?

Hayat: [indiscernible]

Diaz: Were you guys just at the IHOP down in Langley Park?

Hayat: What's the problem?

Diaz: We got a call of a kidnapping, or something like that, were you guys down at the IHOP?

Hayat: There is no kidnapping here, sir.

Diaz: What?

Hayat: There is no kidnapping here, sir.

---

[4] Importantly, neither Luis nor Solano *ever* called this incident a kidnapping. The only report of kidnapping MCPD officers received was the ECC dispatcher who instructed them to "respond priority for kidnapping." ECC Audio, at 00:00:18-00:00:28. That instruction was one created by ECC; Luis never reported that a kidnapping had occurred.

[5] Volume II of the joint appendix contains Diaz's bodycam footage from when he encountered the Hayats at their home. It is cited as Bodycam Footage, at 00:00.

Diaz: Okay, well I just need to make sure everybody is ok.

Hayat: Okay . . . how are you going to do that?

Diaz: Well, we are talking. We are talking.

Hayat: Everything is ok here.

Diaz: Well, I need to check. Are there any kids here?

Hayat: Yes.

Diaz: Well, can we see them?

Hayat: You cannot come into our house. We are both lawyers. I am a professor at [Howard University], she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home.

Norrinda [overheard in the background]: I am a professor of law.

Diaz: Can you come down here for a second?

Hayat: I cannot.

Norrinda: Can you explain to us what is going on here?

Diaz: Yeah, somebody saw something involving some kids at an IHOP . . .

*Hayat v. Diaz*, 766 F. Supp. 3d 512, 520 (D. Md. Feb. 12, 2025) (alteration in original).

Hayat instructed his wife to go back inside the home by stating "Norrinda, walk into our home please. Walk into our home." *Id*. Hayat directed Diaz that "[i]f you would like to come into our home without a warrant . . . ," trailing off as he closed the door to his home. *Id*. Diaz then rushed to the door and grabbed the door handle to prevent Hayat from fully closing and locking the door. Bodycam Footage, at 01:40-01:41. Diaz first yelled "open the door," followed by Officer Nicole Min, who arrived to assist Diaz, who also

yelled for Hayat to "open the door." Bodycam Footage, 01:43-01:47. Both Diaz and Min continued their attempts to open the door and eventually gained entry to the house. Hayat was forced to the ground and handcuffed and, shortly after, MCPD officers observed the Hayat's children and confirmed that no kidnapping occurred. [J.A. 279.]

**II. Procedural History**

Though Hayat raised several claims before the district court, as relevant on appeal, the district court granted summary judgment for the defendant officers on his Fourth Amendment claim. *See Hayat*, 766 F. Supp. 3d at 533.[6] That is, the district court concluded that "Diaz had reasonable articulable suspicion that kidnapping had been committed by [Hayat], to support a *Terry* stop before he entered" the Hayats' home such that "the [d]efendant [o]fficers were justified in following [Hayat] into [his home] to continue investigating the suspected kidnapping." *Id.* at 532–33. The district court concluded that "[d]efendant [o]fficers' entry into the [home] to continue the *Terry* stop was constitutionally permissible under the Fourth Amendment" without any findings as to whether Diaz made an official show of authority such that Hayat would not have felt free to leave. *Id.* at 533.

[6] Like the majority, the district court failed to engage in the appropriate Fourth Amendment inquiry here. Though it made factual findings and concluded that Diaz had reasonable suspicion, *Hayat*, 766 F. Supp. 3d at 530–32, it made no findings as to whether Diaz made a show of authority such that a reasonable person would not feel free to leave. It then proceeded to, like the majority, conflate the *Terry* inquiry with the emergency aid exception, finding that it was constitutionally permissible for officers to enter the home to continue a *Terry* stop. *Id.* at 533.

## III. Standard of Review

We review a district court's grant of summary judgment de novo. *See Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] fact is material if it 'might affect the outcome of the suit under the governing law,' and . . . a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Cooper v. Doyle*, 163 F.4th 64, 77 (4th Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV. Discussion

The Fourth Amendment affords "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. CONST. amend. IV. At the Fourth Amendment's " 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). And it is settled law that police may not enter a home without a warrant without some warrant exception. *See Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

The majority ignores clearly established Fourth Amendment precedent by concluding (1) that Diaz had reasonable suspicion that Hayat kidnapped children, (2) that

Diaz initiated but did not complete a *Terry* stop outside Hayat's home, (3) that *Terry* permitted the officers to enter Hayat's home to complete the *Terry* stop, and (4) that exigent circumstances otherwise justified the officers' entry. I disagree with each of those conclusions.

**A. Diaz Didn't Have Reasonable Suspicion That Hayat Kidnapped Children**

To conclude Diaz had sufficient reasonable suspicion that Hayat committed a kidnapping, the majority weaves together a version of events in this case that, at most, gives consideration only to Diaz's subjective characterization of the facts before us. Looking at the totality of the circumstances, Diaz did not have reasonable suspicion that Hayat kidnapped children because that suspicion was grounded on wholly innocent facts without explanation of why those innocent facts were indicative of more sinister activity.

When an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," an officer may perform a brief investigatory seizure. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). But to justify such an intrusion, the "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. To be clear, an officer must have a " 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013) (quoting *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009)). Officers need more than an "inchoate and unparticularized suspicion or 'hunch,' " *Terry*, 392 U.S. at 27, and we consider the totality of the circumstances to determine whether an officer had sufficient reasonable suspicion, *United States v. Foster*, 824 F.3d

84, 89 (4th Cir. 2016). When a suspect engages in evasive behavior or acts nervously, it is relevant to the circumstances surrounding an officer's suspicion. *See United States v. Mayo*, 361 F.3d 802, 806 (4th Cir. 2004). But we do not categorize "whatever facts are present no matter how innocent as indicia of suspicious activity." *See United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011).

We agree that Diaz's purported reasonable suspicion began when MCPD officers received an ECC dispatch for a kidnapping based on a secondhand caller, Luis.[7] Luis informed ECC that he "saw someone grab three children and put them in the trunk of a vehicle" and that the "someone" was a Black male, driving a black Tesla with a Maryland license plate number 6CC8056. Sheehan ran a license plate match linking the Tesla to a Black male residing at 1 Eastmoor Drive.

But the majority conveniently leaves out Moran's advice to those on the dispatch line that "Tesla's have rear-facing seats in the trunk, so [the children] might be able to sit there." ECC Audio, at 00:02:40-00:02:47. This fact diminishes the likelihood that the children put in the "trunk" of the vehicle were kidnapped and instead indicated that they were buckled into rear-facing seats. And further, the suspect vehicle, a black Tesla, was not in the driveway, nor did Diaz ask where that vehicle might be.

The majority's greatest misstep, however, lies in its characterization of otherwise innocent actions by Hayat and his wife as suspicious. The majority categorizes four other major facts as sufficient grounds to create reasonable suspicion here: (1) the Hayats'

[7] Recall that Luis nor Solano ever characterized what was witnessed as a kidnapping. *See* Diss Op. at 29 n.4.

presence on the porch of their home when Diaz first arrived at their home; (2) the Hayats' lack of surprise with Diaz arrived, "as if [the Hayats] were anticipating it"; (3) Hayat's refusals to confirm whether he had been at IHOP, to show the officers the children in the house, or to allow his wife to speak to the police; and (4) Diaz's exchange with the Hayats based on his "specialized training" as an officer in "recognizing the signs of deception." Maj. Op. at 13–14.

None of those facts are enough to conclude Diaz had reasonable suspicion here. At the start, assuming that two individuals on the porch of their own home must be awaiting police arrival is nonsensical. Suggesting that the Hayats' presence on their porch indicated the couple knew about an ongoing reported kidnapping is merely a label on their activity, it is not "indicative of some more sinister activity." *Foster*, 634 F.3d at 248; *see* J.A. 290. I am particularly "skeptical of [the] 'Government['s] attempts to spin . . . largely mundane acts into a web of deception.' " *Foster*, 824 F.3d at 89 (ellipsis in original) (quoting *Foster*, 634 F.3d at 248).

Neither the Hayats' lack of surprise when confronted by Diaz nor Hayat's refusal to cooperate with Diaz's questioning and requests should be regarded as suspicious either. Courts are " 'not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset.' " *United States v. Slocumb*, 804 F.3d 677, 683 (4th Cir. 2015) (quoting *United States v. Glover*, 662 F.3d 694, 699 (4th Cir. 2011)). The majority determines that Hayat's calm, as opposed to nervous, behavior when Diaz approached Hayat's porch reasonably contributed to Diaz's suspicion. But that would mean that whether a suspect acts nervous or calm, an officer could deem that reaction

suspicious. This is absurd. If we are not to overplay a suspect's nervous behavior when we would otherwise expect them to be nervous, the same is true for when a suspect exhibits calm behavior.

In *Slocumb*, the court held that without adequate explanation of why a defendant's activity would be indicative of more sinister criminal activity, it could not find that officers had reasonable suspicion to seize the defendant. *Id.* at 683–84. There, officers encountered the defendant in a parking lot known for drug activity, late at night, while he and his girlfriend transferred an infant between two vehicles. *Id.* at 679–80. In a conversation lasting less than a minute, the defendant explained that he was in the parking lot because his girlfriend's vehicle had broken down and he came to pick her up. *Id.* at 680. During that interaction, officers noticed that the defendant "appeared to be hurrying [his girlfriend]," that he "did not make eye contact," and that he "gave mumbled responses." *Id.* at 680. Accordingly, officers concluded his explanation did not match his conduct. *Id.* at 682. But the court concluded that the defendant's conduct was "insufficient" as "the only substantial basis for *particularized* suspicion" because the defendant did not flee or "take off in 'headlong flight' " nor exhibit " 'extreme' or unusual nervousness or acts of evasion," and the officers gave no further explanation why that activity was suspicious. *Id.* at 683–84 (first quoting *United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011), then *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and finally *United States v. Foreman*, 369 F.3d 776, 784 (4th Cir. 2004)).

Here, Hayat's conduct was the district court's only substantial basis for particularized suspicion that Hayat was engaged in criminal activity. *See Hayat*, 766 F.

Supp at 532 (concluding that even though the officers' knowledge that Tesla's have rear-facing seats could diminish an officer's suspicion, "Diaz's reasonable suspicion [was] based upon the conduct of [Hayat] once he arrived at the [Hayats' home]"). When Diaz approached the Hayats' home, he only knew there was a reported kidnapping associated with a vehicle with legal rear-facing seats registered to 1 Eastmoor Drive. Upon reaching the porch of the home, Hayat did not immediately walk into his home. He entertained Diaz's presence and denied that any kidnapping occurred. Hayat refused to answer whether he was at IHOP and declined to let officers into his home to see his children. Hayat's instruction to his wife to walk back inside and Hayat's eventual retreat into his home was without hurry or suspicion.

Like *Slocumb*, Hayat "acknowledged [Diaz], was not noticeably nervous, and did not hastily flee the area." *Slocumb*, 804 F.3d at 683 (internal quotation marks omitted) (quoting *Foster*, 634 F.3d at 248). He exercised his right to refuse "to answer any question put to him . . . and . . . go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion). "[A] refusal to cooperate" with a police request by itself is not enough to justify a seizure, *see Florida v. Bostick*, 501 U.S. 429, 437 (1991), and our skepticism of the Government's attempt to spin certain actions by a suspect is "amplified when these mundane acts are incident to the refusal to consent to a [police request],"*Massenburg*, 654 F.3d at 489 (citing *Foster*, 634 F.3d at 248).

The majority regards Diaz's characterizations of his encounter with Hayat as dispositive of what a reasonable officer would have concluded. Maj. Op. at 16. But Hayat did not exhibit any conduct this court has deemed to be suspicious. An officer "must do

more than simply label a behavior as suspicious to make it so." *Foster*, 634 F.3d at 248. He must "articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Foster*, 634 F.3d at 248. And Diaz's characterization of Hayat's otherwise innocent conduct as showing "signs of deception" does not change the result. All he offers is his knowledge, training, and experience conducting interviews and interrogations. J.A. 54. "Although we generally defer to officers' claimed training and experience, we withhold that deference when failing to do so would erode necessary safeguards against 'arbitrary and boundless' police prejudgments." *Wingate v. Fulford*, 987 F.3d 299, 307 (4th Cir. 2021) (quoting *Black*, 707 F.3d at 541). After all, the "very function of the [Fourth] Amendment . . . [is] to ensure that the quick ad hoc judgments of police officers are subject to review and control by the judiciary." *United States v. Robinson*, 414 U.S. 218, 242 (1973) (Marshall, J., dissenting).

We are not to "divide-and-conquer" independent facts to disregard an officer's purported suspicion when those facts taken together might " 'warrant[] further investigation.' " *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002) (quoting *Terry*, 392 U.S. at 22). But taken together, the totality of the circumstances here do no support a conclusion that Diaz had reasonable suspicion that Hayat was engaged in kidnapping.

**B. There Was No *Terry* Stop**

Even if I were to agree that Diaz had reasonable suspicion that Hayat was engaged in kidnapping, he made no seizure based on that suspicion such that a *Terry* stop was initiated. In concluding that Diaz effectuated a seizure, the majority disregards the mandate

that an officer must have *both* reasonable suspicion and make an official show of authority such that a suspect would not feel free to leave.

A person is seized within the meaning of the Fourth Amendment when " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). There are several factors pertinent to our analysis of whether a reasonable person would feel free to leave. Those factors "include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they sought to block his departure or restrain his movement, whether the officers' questioning was nonthreatening, and whether they treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter as "routine" in nature.' " *United States v. Williams*, 180 F.4th 613, 622 (4th Cir. 2026) (quoting *Gray*, 888 F.2d 322–23).

Diaz made no official show of authority before Hayat retreated into his home. Taking each of the relevant factors in turn, the circumstances here would communicate to a reasonable person they are free to leave. For much of the exchange with Hayat, Diaz was the only officer at the scene. When he arrived, Diaz did not activate his sirens or lights. Diaz was in uniform but never displayed a weapon while talking with Hayat and his wife on their porch. There was no sense of urgency nor were any commands made by Diaz when approaching and later talking with the Hayats. No physical contact was made between Diaz and Hayat until Diaz attempted to prevent Hayat from closing the door to his

home. Diaz did not inform Hayat or his wife that they were suspects. He only mentioned that MCPD received a report of kidnapping and asked Hayat about whether there were children inside of his home. And finally, he never requested any identification from Hayat.

I agree with the majority that Diaz's encounter with Hayat began as an otherwise lawful, voluntary encounter. But where we depart is the majority's characterization that Hayat was seized when Diaz prevented Hayat from closing the door to his home. The majority does not tell us when this encounter turned from consensual to investigatory detention. Likely, because this encounter was never converted to such. Instead, the majority concludes that Diaz "gave verbal commands and took physical action indicating that the Hayats were not free to disengage" such that Diaz made a sufficient show of authority that Hayat was not free to leave. Maj. Op. at 19. But that is not how this inquiry works. Diaz made no official show of authority *before* Hayat retreated into his home. Unlike the majority describes, Diaz *never* "vocally told the Hayats to stop" before they reentered their home. Maj. Op at 19. He only yelled "open the door" and physically prevented Hayat from closing the door once Hayat and his wife had *fully* reentered their home. Bodycam Footage, at 01:43-01:47. How could Hayat's "freedom to walk away" be "restrain[ed]" such that he was seized when he had already reentered his home? *Terry*, 392 U.S. at 16.

Because Diaz made no show of authority *before* Hayat reentered his home such that a reasonable person would not feel free to leave, Hayat was never detained and was permitted to retreat into his home. After all, this encounter began on Hayat's porch, a "classic example of an area adjacent to the home" which we refer to as curtilage. *Jardines*,

569 U.S. at 6–7 ("This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' " *Id.* at 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986))). Recall that when officers do not have a warrant and knock on the door of a home, "they [may] do no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469–70. The majority's conclusion flouts that rule.

Imagine the Hayats were inside of their home and officers knocked on their front door. Under the majority's logic, if the Hayats opened the door and spoke with Diaz briefly but then decided to terminate the encounter, Diaz could grab the handle of the Hayats' front door to prevent them from closing the door and that would be a sufficient show of authority that would rid the Hayats' of their right to retreat into their home. That can't be right. *See Johnson v. United States*, 333 U.S. 10, 14 (1948) ("The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance."). Even though Hayat initially consented to this encounter, he was not obligated to "allow the officers to enter the premises" of his home and importantly was permitted to "refuse to answer any questions at any time." *King*, 563 U.S. at 470. Diaz's subsequent entry into the home after Hayat's denial of that encounter was thus a Fourth Amendment violation that should not be cast otherwise as an investigatory detention.

### C. *Terry* Does Not Permit Police Officers to Follow a Suspect Into Their Home

The majority takes its analysis a step further away from the precedent of this court. After it imagines a valid *Terry* stop was initiated here, the majority proceeds to hold that

an officer's initiation of a *Terry* stop is enough for that officer to follow a suspect into their home. The majority creates a rule that "when an officer has reasonable suspicion that criminal activity is afoot and that the activity involves risk of injury, he may, to allay his suspicion and the concern for injury, extend his *Terry* stop of the suspect into the suspect's home following the suspect's retreat." Maj. Op. at 23. It casts *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294 (1967), and *United States v. Santana*, 427 U.S. 38 (1976), Supreme Court cases concerned with the exigent circumstances analysis, as the foundation for its adoption of *Rivera v. Washington*, 57 F. App'x 558, 562 (4th Cir. 2003) (per curiam), a case not concerned with exigency at all. In doing so, the majority imports the exigent circumstances inquiry into a *Terry* analysis, violating the clear lines drawn by Fourth Amendment precedent.

*Warden* lays the foreground for officers to enter a home without a warrant based on "the exigencies of the situation [that] ma[ke] that course imperative." 387 U.S. at 298 (internal quotation marks omitted) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). And in *Santana*, the Court again reaffirmed destruction of evidence and hot pursuit of a fleeing suspect as exigent circumstances permitting warrantless entry. *Santana*, 427 U.S. at 42–43. There, officers had probable cause that Santana was engaged in drug trafficking. *Id.* at 40. Arriving at Santana's home, officers saw her standing in the home's open doorway, immediately exited their vehicle, and yelled "police." *Id.* at 40. Santana retreated into the home and officers followed her inside. Because there was "a realistic expectation that any delay would result in destruction of evidence," the Court upheld the warrantless entry recognizing a "need to act quickly." *Id.* at 42–43. The Court

concluded that retreat into one's home "could 'not defeat an *arrest*' that had 'been set in motion in a public place.' " *Lange v. California*, 594 U.S. 295, 304 (2021) (emphasis added) (quoting *Santana*, 427 U.S. at 42–43).

As shown, both *Warden* and *Santana* are concerned with exigent circumstances where officers entered a home without a warrant to effectuate arrests of fleeing suspects. The majority is correct that these cases "stand for the commonsense proposition that a person who has become a suspect for criminal activity may not rely on the constitutional protections of his house to thwart the officers' attempt to make an arrest." Maj. Op. at 22. The hot pursuit warrant exception persists for that exact reason. But these cases apply when an officer attempts to make an *arrest*, not when an officer makes a brief investigatory stop to allay their suspicion. *See United States v. Leggette*, 57 F.4th 406, 411 (4th Cir. 2023) ("Indeed, by their very definition, *Terry* stops are not the equivalent of an arrest."). And both cases were decided *before* the Supreme Court articulated that the curtilage of one's home, which includes the porch, "is where 'privacy expectations are most heightened,' " making them less persuasive here. *Jardines*, 569 U.S. at 7 (quoting *Ciraolo*, 476 U.S. at 213); *contra Santana*, 427 U.S. at 42 ("While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place. She was not in an area where she had any expectation of privacy.").

Diaz was not chasing a fleeing suspect here. Nor was Diaz set to make an arrest. Diaz and Hayat had a "voluntary encounter in a public place," Hayat's porch, and Hayat

terminated that encounter by entering his home. Maj. Op. at 19. And "[w]here a suspect . . . chooses to end a voluntary conversation with law enforcement and go inside [their] home, that does not constitute flight." *Lange*, 594 U.S. at 329 (2021) (Roberts, C.J., concurring) (citing *Royer*, 460 U.S. at 497–498). Even if I were to conclude that Diaz made an official show of authority to have initiated a *Terry* stop, which clearly is not the case, a thwarted stop does not arise to the same level as a thwarted arrest.

But instead, the majority next marshals *Rivera v. Washington*, 57 F. App'x 558(4th Cir. 2003) (per curiam), an unpublished, nonbinding decision, to conclude that "when an officer has reasonable suspicion that criminal activity is afoot and that the activity involves risk of injury, he may, to allay his suspicion and the concern for injury, extend his Terry stop of the suspect into the suspect's home following the suspect's retreat." Maj. Op. at 23.

In *Rivera*, officers responded to a domestic disturbance call after a resident heard a heated argument in their apartment complex parking lot between a couple. 57 F. App'x at 560. The responding officer told the couple he needed to interview them and ordered the plaintiff, Rivera, to "stand by" while the officer questioned his girlfriend. *Id.* Rivera ignored the officer's orders and entered the backdoor of his apartment. *Id.* After the officer completed questioning the girlfriend, he walked to the open back door and repeatedly asked Rivera to exit the apartment so he could speak with him. After Rivera refused to exit, the officer entered the apartment, began to pull Rivera out of the apartment, and was met with Rivera's resistance. The court held that the officers did not violate Rivera's constitutional rights because "courts have recognized that a person cannot avoid a *Terry* stop simply by

retreating into a home." *Rivera*, 57 F. App'x at 562. But *Rivera*'s conclusion relied on a district court case that did not concern a *Terry* stop made inside of one's home.[8]

The majority nonetheless deems *Rivera* instructive in this case, even though its use of *Rivera* conflates a *Terry* stop—a brief seizure occurring in a public place—with warrantless entry into a home pursuant to an exigent circumstance. Implicit in a *Terry* stop is an officer's need to investigate criminal activity that might be afoot. And separate and apart from *Terry*, officers are permitted to make entry into a home when they have " 'an objectively reasonable basis for believing' that . . . entry was direly needed to prevent or deal with serious harm." *Case v. Montana*, 607 U.S. 107, 117 (2026) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 400 (2006)).

In *Case*, the Supreme Court expressly declined to apply the reasonable suspicion standard to home entries and instead reaffirmed that *Brigham City* "formulated its own standard for dealing with household emergencies—again, whether an officer has 'an objectively reasonable basis for believing' that an occupant is seriously injured or imminently threatened with such harm." *Id.* at 116 (quoting *Brigham City*, 547 U.S. at

---

[8] The court relied on our summary affirmance of *Harbin v. City of Alexandria*, 712 F. Supp. 67 (E.D. Va. 1989), *aff'd*, 908 F.2d 967 (4th Cir. 1990). In *Harbin*, the district court found the police lawfully "stopped" a plaintiff in his home after they received a report that the plaintiff was brandishing a gun nearby. *Id.* at 68–69. The officers followed a man who matched the suspect's description to his home. *Id.* at 69. As the man crossed the threshold of his home into his living room through an open door, the officer yelled for him to stop and turn around with his hands above his head. *Id.* The man did so and stepped out onto the porch of his home. *Id.* Importantly, the officers never entered the suspect's home nor did the encounter last more than five minutes. Therefore, the court found the encounter was reasonable.

400). And most importantly, the Court indicated that emergency aid situations necessitate a different lens than that "generally used to consider investigative activity." *Case*, 607 U.S. at 507 (determining the probable-cause standard, which is related to criminal investigations, does not fit into the emergency-aid context, which is a not concerned with criminal activity or investigation).

By permitting officers to allay suspicion by entering a home without a warrant using reasonable suspicion of ongoing criminal activity that might involve risk of injury, the majority "erroneously [seeks] to apply a lower standard akin to reasonable suspicion" to the exigent circumstances inquiry and cast that rule as part of the court's *Terry* jurisprudence. *Case*, 607 U.S. at 120 (Sotomayor, J., concurring). Because the majority's approach is grounded in nonbinding, inapplicable precedent and conflicts with longstanding Supreme Court precedent requiring a warrant or warrant exception to enter a home, I must dissent.

**D. There Were No Exigent Circumstances Justifying Entry Into Hayat's Home**

And finally, the majority is confident that exigent circumstances justified the officers' entry into Hayat's home to check on the children inside. The majority concludes that Diaz's suspicion that Hayat was engaged in kidnapping combined with the nature of the crime constituted exigent circumstances justifying entry into the Hayats' home. But in reaching that conclusion, the majority disregards the exigent circumstances inquiry, as clearly established by Supreme Court precedent.

There are three recognized exceptions to the warrant requirement wherein officers may enter a home without one, best known as exigent circumstances. Officers may enter

"to prevent the imminent destruction of evidence," *Brigham City*, 547 U.S. at 403, "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *id.*, or when in hot pursuit of a fleeing suspect, *Santana*, 427 U.S. at 42–43. Neither the destruction of evidence nor hot pursuit exceptions are relevant here. The district court, albeit indirectly, relied on the emergency aid exception to justify the warrantless entry into Hayat's home.

The emergency aid exception permits officers to enter a home without a warrant if they have an objectively reasonable basis that their intervention is necessary to prevent serious harm. *Case*, 607 U.S. at 118–19. If a general emergency is "enveloped by a sufficient level of urgency," that situation may constitute an exigent circumstance. *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013). But not all dangerous emergencies immediately justify a warrantless entry. Such encroachment onto one's property is "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (citing *Terry*, 392 U.S. at 25–26).

For many of the same reasons that I conclude Diaz did not have reasonable suspicion, I find he did not have an objectively reasonable basis for entering Hayat's home pursuant to exigent circumstances. To begin, the Supreme Court has made clear that *Brigham City*'s reasonableness standard is a heightened inquiry compared to the reasonable suspicion inquiry. *See Case*, 607 U.S. at 116 ("*Brigham City* did not adopt *Terry*'s reasonable-suspicion standard for home entries.").

The tip given by Luis and the eyewitness account by Solano only confirmed that a Black male was seen putting three children in a trunk at an IHOP, yelling at those children,

and closing the trunk. Those facts alone could reasonably lead one to conclude that a kidnapping was afoot, but that suspicion was allayed once officers knew that the suspect vehicle was a Tesla with legal rear-facing seats. Beyond that, the officers did not obtain additional information or observe any conduct that would cause Diaz or any other officer to suspect that Hayat was engaged in a kidnapping. *See Brown*, 401 F.3d 588, 596 (holding that a "brief, general description" of the defendant, his whereabouts, and an allegation he was carrying a firearm was not enough for reasonable suspicion because the officers had not acquired additional information nor did they "observe any conduct by [the defendant] that would cause them to suspect that he was carrying a firearm").

And what's more, there was no indication from the eyewitness or the anonymous tip that the children were in immediate danger. Hayat's choice "to end a voluntary conversation with law enforcement and go inside [his] home" did not constitute flight or indicate that the children in the home might be in danger. *Lange*, 594 U.S. at 329 (Roberts, C.J., concurring) (citing *Royer*, 460 U.S. at 497–498).

A tip indicating a Black male yelled at children in the trunk of a Tesla with legal rear-facing seats without any identifying information about those children or other conduct that would have heightened the danger faced by those children, is not enough to meet the standard here. This is an objective inquiry, not one "depend[ing] on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). It does not matter what Diaz necessarily thought, but what would have been objectively reasonable to think under the circumstances

before us. And under these circumstances, I believe Diaz's entry was not objectively reasonable.

## V. Conclusion

For the above reasons, I would have reversed the district court's grant of summary judgment. The majority deeply mischaracterizes the facts of this case to achieve its desired holding—a conclusion that disregards the Fourth Amendment and renders its protections toothless. What I can't understand is how the majority begins by parroting Fourth Amendment guarantees while in the same breath denying Hayat those basic rights. "[T]he principles we express [must] comport with the actions we take." *Acevedo*, 500 U.S. at 583 (Scalia, J., concurring in the judgment). And the actions taken by the majority abrade clearly established Supreme Court and Fourth Circuit precedent.

Today's decision is in direct conflict with the basic principles and safeguards of the Fourth Amendment. And the "majority attempts to gloss over the violence that today's decision does to the Fourth Amendment with empty admonitions." *Bostick*, 501 U.S. at 450 (1991) (Marshall, J., dissenting). I respectfully dissent.